# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re   Petters Company, Inc., et al., | **Jointly Administered under Case No. 08-45257** |
| Debtors. | Court File Nos.: |
| (includes: | 08-45258 (GFK) |
| Petters Group Worldwide, LLC; | 08-45326 (GFK) |
| PC Funding, LLC; | 08-45327 (GFK) |
| Thousand Lakes, LLC; | 08-45328 (GFK) |
| SPF Funding, LLC; | 08-45329 (GFK) |
| PL Ltd., Inc.; | 08-45330 (GFK) |
| Edge One LLC; | 08-45331 (GFK) |
| MGC Finance, Inc.; | 08-45371 (GFK) |
| PAC Funding, LLC; | 08-45392 (GFK) |
| Palm Beach Finance Holdings, Inc.) | Chapter 11 Cases |

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtors Petters Company, Inc. and
PL Ltd., Inc.,

Plaintiff,

vs.                                                                      ADV. NO. _____

Westford Special Situations Master Fund, L.P.;
Westford Global Asset Management, Ltd.; Westford
Special Situations Fund, Ltd.; Westford Special
Situations Fund, L.P.; Westford Asset Management,
LLC; Epsilon Global Master Fund, L.P.; Epsilon
Global Active Value Fund, Ltd.; Epsilon Global
Active Value Fund I-B Ltd.; Epsilon Global Active
Value Fund, L.P.; Epsilon Global Master Fund II, L.P.
a/k/a Epsilon Global Master Fund II, L.P., Sub 1;
Epsilon Global Active Value Fund II, Ltd., f/k/a
Westford Investment Fund Ltd.; Epsilon Global
Active Value Fund II-B Ltd.; Epsilon Global Active
Value Fund II-G Ltd.; Epsilon Global Active Value
Fund II, L.P.; Epsilon Global Active Value Fund II-B,
L.P.; Epsilon Global Active Value Fund II-G, L.P.;
Epsilon Global Asset Management, Ltd.; Epsilon
Investment Management, LLC; Epsilon Global Master
Fund III – Structured Strategies, L.P.; Epsilon Global
Active Value Fund III Ltd.; Capital Strategies Fund
Ltd.; Stafford Towne, Ltd.; and Steve Goran
Stevanovich,

Defendants.

**COMPLAINT**

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc. and PL Ltd., Inc., by and through his legal counsel, Lindquist & Vennum P.L.L.P., as and for his Complaint against defendants Westford Special Situations Master Fund, L.P., Westford Global Asset Management, Ltd.; Westford Special Situations Fund, Ltd.; Westford Special Situations Fund, L.P.; Westford Asset Management, LLC; Epsilon Global Master Fund, L.P.; Epsilon Global Active Value Fund, Ltd.; Epsilon Global Active Value Fund I-B Ltd.; Epsilon Global Active Value Fund, L.P.; Epsilon Global Master Fund II, L.P. a/k/a Epsilon Global Master Fund II, L.P., Sub 1; Epsilon Global Active Value Fund II, Ltd., f/k/a Westford Investment Fund Ltd.; Epsilon Global Active Value Fund II-B Ltd.; Epsilon Global Active Value Fund II-G Ltd.; Epsilon Global Active Value Fund II, L.P.: Epsilon Global Active Value Fund II-B, L.P.; Epsilon Global Active Value Fund II-G, L.P.; Epsilon Global Asset Management, Ltd.; Epsilon Investment Management, LLC; Epsilon Global Master Fund III – Structured Strategies, L.P.; Epsilon Global Active Value Fund III Ltd.; Capital Strategies Fund Ltd.; Stafford Towne, Ltd.; and Steve Goran Stevanovich, states and alleges as follows:

**PARTIES**

**I.     PCI AND ITS ALTER EGO PL LTD.**

1.     Debtor Petters Company, Inc. ("PCI") is a corporation organized under the laws of the State of Minnesota.

2.     PCI is, and at all times relevant herein was, wholly owned by Thomas Joseph Petters, an individual and citizen of the state of Minnesota ("Petters").

3. Debtor PL Ltd., Inc. ("PL Ltd."), formerly known as Petters Ltd., Inc., is a corporation organized under the laws of the State of Minnesota.

4. PL Ltd. is, and at all times relevant herein was, wholly owned by PCI (PCI and PL Ltd. are collectively referred to as the "Debtors").

## II. STEVE GORAN STEVANOVICH.

5. Steve Goran Stevanovich is, and at all times relevant herein was, the founder, portfolio manager, president and an owner of Epsilon Investment Management, LLC, ("Epsilon Management," as further defined below) and Westford Investment Management, LLC ("Westford Management," as further defined below). Stevanovich is a citizen of the United States of America, with a last known residential address of 7521 Isla Verde Way, Delray Beach, FL 33446, a residence he claims as his homestead. Stevanovich also is known to reside in Montreux, Switzerland and, on information and belief, petitioned to have his named change in 1993 from Goran Zivadin Stevanovich to Steve Goran Stevanovich.

6. Stevanovich is, and at all times relevant herein was, a sophisticated hedge fund investment manager, adviser and promoter who became one of the largest investors in the Petters Ponzi scheme. Prior to forming Epsilon Management and Westford Management, Stevanovich had over 18 years of experience in international investment management. He was the Executive Vice President of Everest Capital Limited, a billion-dollar global hedge fund, and he had over seven years of experience in corporate finance and investment banking, including working with the leveraged buyout firm of Ingoldsby, O'Connor, Altwell & Company.

7. Stevanovich received a Bachelor of Arts degree in economics from the University of Chicago in 1985 and a Masters of Business Administration degree from the same institution in 1990. Stevanovich currently is on the Board of Trustees for the University of Chicago.

8.     Each of the Epsilon and Westford funds, described in detail below, that invested in the Petters Ponzi scheme did so through what is commonly referred to as a master-feeder fund structure, pursuant to which an offshore master fund, located in the Cayman Islands or British Virgin Islands, would invest in the Petters Ponzi scheme through PCI's alter ego, PL Ltd. Each master fund operated at the direction of its general partner and investment manager, also often an offshore entity, and was most often funded through two feeder funds: an onshore feeder fund incorporated in Delaware and an offshore feeder fund formed in the British Virgin Islands. The feeder funds invested primarily in shares of their respective master fund, which in turn invested in the Petters Ponzi scheme. However, on information and belief, at the direction of Stevanovich, funds derived from the respective feeder funds may have been commingled and invested in master funds other than their intended parent master fund. On information and belief, the investment manager of each offshore feeder fund was also the general partner of the respective master fund, and in each instance, served at the sole direction of Stevanovich, in his capacity as a general partner and director of the respective management company, as well as in his capacity as a director and shareholder of the master fund. The onshore feeder funds were similarly managed and directed at all times by Stevanovich, in his capacity as the president and founder of the onshore management companies, Epsilon Management and Westford Management, respectively. Attached hereto as **Exhibit A** is, on information and belief, a standard offering memorandum of the Epsilon and Westford funds—particularly relating to Epsilon Global Active Value Fund II, Ltd., an Epsilon offshore feeder fund—for purposes of illustrating the organization of the master-feeder fund structure utilized by Stevanovich with respect to all the Epsilon and Westford funds identified herein.

9.     In his capacity as an owner of Epsilon Management and Westford Management, as well as the international management companies described herein, and a manager, adviser and *de facto* beneficiary of each of the Epsilon and Westford funds described in detail below, Stevanovich received

4

millions in false profits through his active and direct involvement in the Petters Ponzi scheme. Stevanovich was directly involved with the operations and management of the Epsilon and Westford Funds, and served as the final decision maker regarding them. Stevanovich and his immediate and extended family became exceptionally wealthy as a result of the Epsilon and Westford Funds' investments in the Petters Ponzi Scheme, including, on information and belief, millions of dollars received by Stevanovich in management fees, performance fees, and false profits. On information and belief, Stevanovich used those monies received through the Petters Ponzi Scheme to fund his extravagant lifestyle, including maintaining a mansion in Montreux, Switzerland.

10. Upon reaping millions of dollars through the Petters Ponzi scheme, Stevanovich continued in his international investment endeavors. For example, in or about 2008, Stevanovich started a new investment firm called SGS Asset Management located in the Federation of Saint Kitts and Nevis.

11. On information and belief, Stevanovich has caused the billions of dollars in transfers, and millions of dollars in false profits, identified herein to be subsequently transferred to additional hedge funds owned and operated by Stevanovich, including but not limited to additional funds located in the Cayman Islands and the British Virgin Islands that remain under Stevanovich's direction, management and control. The Trustee's investigation in this regard continues.

## III.    THE WESTFORD FUNDS.

12. Westford Special Situations Master Fund, L.P. (the "Westford Master Fund") is a limited partnership formed under the laws of the Cayman Islands with its registered office at Maples and Calder, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands. Westford Master Fund, at the direction of Stevanovich, served as a source of millions of dollars of funds for PCI and PL Ltd. and the Ponzi scheme. The Westford Master Fund had two main investors at all times relevant herein: an offshore feeder fund formed under the laws of the British Virgin Islands

5

and an onshore feeder fund formed in the State of Delaware. Stevanovich was at all times a director of the Westford Master Fund.

13. On information and belief, at all times relevant hereto Westford Master Fund's general partner was Westford Global Asset Management, Ltd. ("Westford Global Asset Management"), a Cayman Islands company with its registered office at Maples and Calder, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands. On information and belief, Stevanovich was president of Westford Global Asset Management, Ltd., which received a 2% management fee and a 20% performance fee on all investments made by the Westford Master Fund in the Petters Ponzi Scheme. Stevanovich was responsible for all investment decisions made by Westford Global Asset Management relating to the Westford Master Fund, including Westford Master Fund's investments in the Petters Ponzi scheme. On information and belief, Stevanovich is, and at all relevant times was, an owner and director of Westford Global Asset Management.

14. Westford Special Situations Fund Ltd. (the "Westford SS Offshore Feeder Fund") is a company organized as an international business company under the International Business Companies Act of the British Virgin Islands and is also registered to do business in the Cayman Islands. The registered agent and office of the Westford SS Offshore Feeder Fund is HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. At all times relevant herein, the Westford SS Onshore Feeder Fund served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Westford Master Fund. On information and belief, either Westford Global Asset Management or Westford Management was the investment manager of the Westford SS Offshore Feeder Fund at all times relevant hereto. On information and belief, often the sole asset owned by the Westford SS Offshore Feeder Fund was shares of the Westford Master Fund. However, Westford Special Situations Fund Ltd. also directly entered into note

transactions with PL Ltd., outside of its investments through the Westford Master Fund.  On February 11, 2010, the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands appointed a liquidator of the Westford SS Offshore Feeder Fund.  On information and belief, the liquidation proceedings of the Westford SS Offshore Feeder Fund have since been terminated, and the fund is no longer the subject of insolvency or liquidation proceedings.

15.    Westford Special Situations Fund L.P. (the "Westford SS Onshore Feeder Fund") is a limited partnership organized under the laws of Delaware with its registered office located at National Registered Agents, 160 Greentree Drive, Suite 101, Dover, Delaware 19904.  At all times relevant herein,  the Westford SS Onshore Feeder Fund served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Westford Master Fund.  Westford Special Situations Fund L.P. directly entered into note transactions with PL Ltd., in addition to investing in the Petters Ponzi scheme through the purchase of shares in the Westford Master Fund.  Stevanovich, in his capacity as the managing member of Westford Management, formed the Westford SS Onshore Fund.  Westford Management is the general partner of the Westford SS Onshore Fund.   As the fund's general partner and investment manager, on information and belief, Westford Management was responsible for directing all investment activities of the Westford SS Onshore Feeder Fund and earned management fees and performance fees from the Westford SS Onshore Feeder Fund.  On information and belief, the vast majority, if not all, of the management and performance fees earned by Westford Management were received by Stevanovich, directly or in his capacity as the general partner of Westford Management, or by individuals and entities designated by Stevanovich.

16.    Westford Asset Management, LLC ("Westford Management") is a Delaware limited liability company originally formed on May 26, 2000 under the name Bridgewater Capital Management, LLC, and maintained a principal place of business during the time period relevant hereto at either One

Boca Place, Suite 324A, 2255 Glades Road, Boca Raton, Fl 33431 or 7280 W. Palmetto Park Road, Boca Raton, Florida 33433. Stevanovich was the founder, president and manager of Westford Management at all times relevant to the claims stated herein. On information and belief, all notices and correspondence to Westford Global Asset Management relating to the management and performance of the Westford Master Fund and the Westford SS Offshore Feeder Fund were to be directed to Westford Management at one of the above addresses in Boca Raton, Florida. On information and belief, Westford Management currently maintains a principal place of business at First Canadian Place, 100 King Street West, Suite 5715, Toronto, Ontario, M5X 1A9, Canada, which location is the current principal place of business of Epsilon Management.

17. On February 4, 2010, Stevanovich authored a memorandum to numerous Epsilon and Westford funds, including the Westford Special Situations Onshore and Offshore Feeder Funds. In that memorandum, Stevanovich notified all investors that he was temporarily suspending redemptions of shares or limited partnership interests and further notified all investors that the Westford Special Situations Onshore and Offshore Feeder Funds were under investigation by the U.S. Securities and Exchange in connection with an order of investigation relating to the valuation of the loan investments within the Westford portfolio.

## IV.    THE EPSILON FUNDS.

18. Epsilon Global Master Fund L.P. ("Epsilon I Master Fund") is a limited partnership formed under the laws of the Cayman Islands with its registered office located at Maples and Calder, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands. Epsilon I Master Fund, at the direction of Stevanovich, served as a source of millions of dollars of funds for PCI and PL Ltd. in the Ponzi scheme. Epsilon I Master Fund had offshore feeder funds

formed under the laws of the British Virgin Islands and an onshore feeder fund formed in the State of Delaware.  Stevanovich was at all times a director of the Epsilon I Master Fund.

19.　　On information and belief, the offshore feeder funds of the Epsilon I Master Fund included Epsilon Global Active Value Fund, Ltd. and Epsilon Global Active Value Fund I-B, Ltd., each of which is organized as an international business company under the International Business Companies Act of the British Virgin Islands and is registered to do business in the Cayman Islands (collectively referred to herein as the "Epsilon I Offshore Feeder Funds").  The registered agent and office of each of the Epsilon I Offshore Feeder Funds is HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.  At all times relevant herein,  the Epsilon I Offshore Feeder Funds served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Epsilon I Master Fund.

20.　　On information and belief, the onshore feeder fund of the Epsilon I Master Fund was Epsilon Global Active Value Fund, L.P. (the "Epsilon I Onshore Feeder Fund"), a limited partnership organized under the laws of Delaware with its registered office located at National Registered Agents, 160 Greentree Drive, Suite 101, Dover, Delaware 19904.  At all times relevant herein,  the Epsilon I Onshore Feeder Fund served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Epsilon I Master Fund.  Stevanovich, in his capacity as the manager of Epsilon Management f/k/a Epsilon N.A. Limited, formed the Epsilon I Onshore Fund on or about April 14, 1998.

21.　　Epsilon Global Master Fund II, L.P., a/k/a Epsilon Global Master Fund II, L.P., Sub 1 ("Epsilon II Master Fund") is a limited partnership formed under the laws of the Cayman Islands with its registered office located at Maples and Calder, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.  The Epsilon II Master Fund, at the direction

of Stevanovich, served as a source of millions of dollars of funds for PCI and PL Ltd. in the Ponzi scheme. Epsilon II Master Fund had offshore feeder funds formed under the laws of the British Virgin Islands and an onshore feeder fund formed in the State of Delaware. Stevanovich was at all times a director of the Epsilon II Master Fund.

22. On information and belief, the offshore feeder funds of the Epsilon II Master Fund included Epsilon Global Active Value Fund II, Ltd., f/k/a Westford Investment Fund Ltd.; Epsilon Global Active Value Fund II-B, Ltd., and Epsilon Global Active Value Fund II-G, Ltd.; each of which is organized as an international business company under the International Business Companies Act of the British Virgin Islands and is registered to do business in the Cayman Islands (collectively referred to herein as the "Epsilon II Offshore Feeder Funds"). The registered agent and office of the Epsilon II Offshore Feeder Funds is HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. At all times relevant herein, the Epsilon II Offshore Feeder Funds served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Epsilon II Master Fund.

23. On information and belief, during the time period relevant hereto, the onshore feeder funds of the Epsilon II Master Fund were Epsilon Global Active Value Fund II, L.P.; Epsilon Global Active Value Fund II-B, L.P.; and Epsilon Global Active Value Fund II-G, L.P.; (the "Epsilon II Onshore Feeder Funds"), each of which is a limited partnership organized under the laws of Delaware with its registered office located at National Registered Agents, 160 Greentree Drive, Suite 101, Dover, Delaware 19904. At all times relevant herein, the Epsilon II Onshore Feeder Funds served as a source of funds for PCI and PL Ltd. in the Ponzi scheme, either directly or through investments in the Epsilon II Master Fund. Stevanovich, in his capacity as the manager of Epsilon Management, formed the

Epsilon II Onshore Funds, each of which maintained a principal place of business at 7280 W. Palmetto Park Road, Suite 310, Boca Raton, Florida.

24.     On information and belief, at all times relevant hereto Epsilon Global Asset Management, Ltd. ("Epsilon Global Asset Management") was the general partner and investment manager of each of the Epsilon Master Funds identified herein.  Epsilon Global Asset Management is a Cayman Islands Corporation with a registered agent and office of Maples and Calder, Ugland House, PO Box 309, George Town, Grand Cayman, Cayman Islands.  On information and belief, Stevanovich was president of Epsilon Global Asset Management at all times relevant hereto.  On information and belief, Epsilon Global Asset Management, Ltd., received a 2% management fee and a 20% performance fee on all investments made by the Epsilon Master Funds the Petters Ponzi scheme.  Stevanovich was responsible for all investment decisions made by Epsilon Global Asset Management relating to the Epsilon Master Funds, including the Epsilon Master Funds' investments in the Petters Ponzi scheme.  On information and belief, Stevanovich is, and at all relevant times was, an owner and director of Epsilon Global Asset Management.

25.     Defendant Epsilon Investment Management, LLC, f/k/a Epsilon N.A. Limited ("Epsilon Management") is a limited liability company organized under the laws of the State of Delaware with its principal place of business formerly located at 7280 West Palmetto Park Rd., Boca Raton, Florida 33433, and is currently doing business in Canada and maintaining a principal place of business at First Canadian Place, 100 King Street West, Suite 5715, Toronto, Ontario, M5X 1A9, Canada.  In addition, Epsilon Management also maintains a place of business located at Grand Rue 3, 6th Floor, CH-1820 Montreux, Switzerland.  At all times relevant hereto, Stevanovich was the founder, president and manager of Epsilon Management, either directly in his personal capacity or indirectly as the sole owner

of the relevant general partner or managing member, including but not limited to, Epsilon N.A. Limited, 16 Rainbow Ridge Drive, Livingston, New Jersey 07039.

26.     At all times relevant herein, Epsilon Management was the general partner and investment manager of all Epsilon-affiliated onshore feeder funds used to invest in the Petters Ponzi scheme through the Epsilon Master Funds, including but not limited to Epsilon Global Active Value Fund, L.P.; Epsilon Global Active Value Fund I-B, L.P.; Epsilon Global Active Value Fund II, L.P.; Epsilon Global Active Value Fund II-B, L.P.; and Epsilon Global Active Value Fund II-G, L.P., each of which was formed in the State of Delaware.  At all times relevant herein, Epsilon Management maintained a principal place of business of the Epsilon Onshore Feeder Funds at 7280 West Palmetto Park Road, Suite 310, Boca Raton, Florida.

27.     On information and belief, at all times relevant to this Complaint, all notices and correspondence to Epsilon Global Asset Management relating to the management and performance of the Epsilon Master Funds and the Epsilon Offshore Feeder Funds were directed to Epsilon Management in Boca Raton, Florida.

28.     As the general partner and investment manager of the Epsilon I and II Onshore Feeder Funds, on information and belief, Epsilon Management was responsible for directing all investment activities of the Epsilon I and II Onshore Feeder Funds and earned management fees and performance fees from the Epsilon I and II Onshore Feeder Funds, as well as other funds that operated under the direction of Stevanovich, such as Capital Strategies Fund Ltd.  On information and belief, the vast majority, if not all, of the management and performance fees earned by Epsilon Management were received by Stevanovich, directly or in his capacity as the general partner of Epsilon Management, or by individuals and entities designated by Stevanovich.

29.     In addition to the Epsilon I Master Fund and the Epsilon II Master Fund, and their respective feeder funds, Stevanovich also caused funds to be invested in the Petters Ponzi scheme through two additional funds: Epsilon Global Master Fund III – Structured Strategies, L.P. and Epsilon Global Active Value Fund III Ltd.

30.     On information and belief, Epsilon Global Master Fund III – Structured Strategies, L.P. is a British Virgin Islands Company, registered to do business in the Cayman Islands, but formed and doing business under the name of Epsilon Global Active Value Fund III B – Structured Strategies, Ltd., an international business company under the International Business Companies Act of the British Virgin Islands with a registered agent and office of HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands (collectively referred to herein as the "Epsilon Structured Strategies Fund").   On information and belief, the investment manager and general partner of the Epsilon Structured Strategies Fund is Epsilon Management or Epsilon Global Asset Management.   The Trustee's investigation into the Epsilon Structured Strategies Fund is ongoing.

31.     On information and belief, Epsilon Global Active Value Fund III Ltd. is a British Virgin Islands Company under the International Business Companies Act of the British Virgin Islands with a registered agent and office of HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.   On information and belief, the investment manager and general partner of the Epsilon Structured Strategies Fund is Epsilon Management or Epsilon Global Asset Management. The Trustee's investigation into the Epsilon Structured Strategies Fund is ongoing.

## V.     CAPITAL STRATEGIES, LTD. & STAFFORD TOWNE, LTD.

32.     Capital Strategies Fund Ltd. ("Capital Strategies") is a company organized under the laws of the British Virgin Islands with its registered office at HWR Services Limited, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. In addition to investments made through the

Westford and Epsilon I and II Master Feeder Funds identified above, Stevanovich also invested in the Petters Ponzi Scheme independently through Capital Strategies. At the direction of Stevanovich, Capital Strategies directly invested millions in the Petters Ponzi scheme and thereby served as a source of funds for PCI and PL Ltd. in the Ponzi scheme. On information and belief, Capital Strategies may have also invested in the Petters Ponzi scheme through additional investments in the Epsilon I and II and Westford Master Funds. At all times relevant hereto, Epsilon Management was the investment manager of Capital Strategies. On information and belief, Stevanovich was an owner and director of Capital Strategies at all times relevant hereto.

33. On information and belief, Defendant Stafford Towne, Ltd. ("Stafford") is a company organized under the laws of the British Virgin Islands and served as the administrative agent for all Epsilon and Westford funds, as well as for Capital Strategies, Westford Management and Epsilon Management. Although a British Virgin Islands company, at all times relevant hereto, Stafford maintained a principal place of business at the same location as Westford Management and Epsilon Management, namely, 7280 W. Palmetto Park Road, Boca Raton, FL 33433. On information and belief, Stevanovich was the founder, principal and sole member and director of Stafford at all times relevant herein, and utilized Stafford as a special purpose entity solely for administrative purposes to facilitate entering into the loan investment transactions with the Petters Ponzi scheme on behalf of all of the Epsilon and Westford Funds, as well as Capital Strategies, and to create the false appearance of distance between the Epsilon and Westford Funds and Petters, PCI and PL Ltd.

34. For purposes of all allegations and pleadings stated herein, the term "Epsilon Funds" is defined to include Epsilon Management, Epsilon Global Asset Management, the Epsilon I Master Fund and its Onshore and Offshore Feeder Funds identified and described above, the Epsilon II Master Fund

and its Onshore and Offshore Feeder Funds, the Epsilon Structured Strategies Fund, the Epsilon Global Active Value Fund III, the Capital Strategies Fund, Stafford Towne Ltd., and Steve Stevanovich.

35. For purposes of all allegations and pleadings stated herein, the term "Westford Funds" is defined to include Westford Management, Westford Global Asset Management, the Westford Master Fund and its Onshore and Offshore Feeder Funds identified and described above, the Capital Strategies Fund, Stafford Towne Ltd., and Steve Stevanovich.

## VI.    JURISDICTION.

36. Defendants, the Epsilon Funds and the Westford Funds as those terms are defined herein, are subject to personal jurisdiction in the District of Minnesota on the grounds that they conducted business within the State and District of Minnesota pertaining to financial transactions by and between entities owned, managed or controlled by Stevanovich and conducted business for his benefit and on his behalf. Defendants likewise are subject to personal jurisdiction in the District of Minnesota on the grounds that Federal Rule of Bankruptcy Procedure 7004 provides for nationwide service of process. This United States Bankruptcy Court therefore holds personal jurisdiction over any defendant with minimum contacts with the United States, such as Defendants.  Defendants had routine, repeated contacts with the United States through their transactions with Tom Petters, the Petters Ponzi scheme, and PL Ltd., all of which was brokered by, and overseen by, Stevanovich, a resident of the State of Florida who maintained, operated and directed the operations of the Epsilon and Westford Funds, Epsilon Management, Westford Management and Stafford all out of the primary offices located in Boca Raton, Florida, during the time periods relevant hereto.  Further, the transactions that form the basis for the claims asserted herein were entered through Stafford's principal place of business, located at 7280 West Palmetto Park Road, Boca Raton Florida, pursuant to loan documents and agreements that

specifically contained forum selection clauses providing that the transactions were to be enforced within the State of Minnesota.

## PROCEDURAL BACKGROUND

37.     On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota (the "District Court") placed PCI and PL Ltd. into receivership in civil litigation commenced by the United States of America against, among others, Petters and PCI (Court File No. 08-CV-5348) (the "Receivership Action").

38.     By Order of the District Court in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008, the District Court appointed Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI and PL Ltd.

39.     As the court-appointed Receiver, Kelley serves as an agent of the District Court and in that capacity had exclusive custody, control, and possession of the property, assets, and estates of PCI and PL Ltd.

40.     On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in Court File No. 08-45257.

41.     On October 15, 2008, PL Ltd., at the Receiver's direction, filed a petition for relief under Chapter 11 of the Bankruptcy Code in Court File No. 08-45326.

42.     On October 22, 2008, this Court ordered the above-captioned bankruptcy cases be administratively consolidated as *In re Petters Company Inc., et al.* under case number 08-45257.

43.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley as the Chapter 11 Trustee (the "Trustee") for all Chapter

11 debtors in this jointly administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI and PL Ltd.

## JURISDICTION, VENUE AND STANDING

44.     This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

45.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (K), (H), and (O).

46.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

47.     The Trustee has standing to assert the claims herein pursuant to sections 323, 544, 548, 550, and 1106 of the Bankruptcy Code.

## NATURE OF PROCEEDING

48.     The Trustee brings this adversary proceeding against defendants, pursuant to sections 105(a), 506, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-51, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states and other applicable law to recover preferences, fraudulent conveyances, damages, and disgorgement, prevent unjust enrichment, and to impose a constructive trust in connection with transfers of property by PCI to defendants— through the artifice of PL Ltd.

49.     Defendants Westford Master Fund, Westford SS Offshore Feeder Fund, Westford SS Onshore Feeder Fund, Westford Global Asset Management, and Westford Management are initial transferees of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person or entity

17

for whose benefit such transfers were made, or immediate or mediate transferees of any initial transferee of such transfers.

50.  Defendant Epsilon Master Fund I, Epsilon I Offshore Feeder Funds, Epsilon I Onshore Feeder Funds, Epsilon Global Asset Management, and Epsilon Management are initial transferees of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person or entity for whose benefit such transfers were made, or immediate or mediate transferees of any initial transferee of such transfers.

51.  Defendant Epsilon Master Fund II, Epsilon II Offshore Feeder Funds, Epsilon II Onshore Feeder Funds, Epsilon Global Asset Management, and Epsilon Management are initial transferees of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person or entity for whose benefit such transfers were made, or immediate or mediate transferees of any initial transferee of such transfers.

52.  Defendant Epsilon Structured Strategies Fund, as that term is defined herein, is an initial transferee of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

53.  Defendant Epsilon Global Active Value Fund III is an initial transferee of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

54.  Defendant Capital Strategies is an initial transferee of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

55.  Defendant Stafford is an initial transferee of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

56.     Defendant Stevanovich is an initial transferee of the fraudulent, or other avoidable transfers alleged in this Complaint, or a person for whose benefit such transfers were made, or an immediate or mediate transferee of any initial transferee of such transfers.

57.     At all times relevant hereto, PL Ltd. operated as an alter ego and shell company of PCI to the detriment of PCI's creditors. All such property transferred to defendants under the name of PL Ltd. was property owned and controlled by PCI.

58.     The Trustee seeks to set aside such transfers, recover, and preserve the property of PL Ltd.—which at all times relevant herein was the de facto property of PCI—for the benefit of defrauded individuals and organizations that are creditors of PCI.

## FACTUAL BACKGROUND

### I.     THE PETTERS PONZI SCHEME

#### A.     Petters and his Associates Utilized PCI and its Alter Ego, PL Ltd., to Conduct the Ponzi Scheme.

59.     This adversary proceeding arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters and business organizations that he controlled (the "Ponzi scheme").

60.     Petters operated the Ponzi scheme with the assistance of other individuals within certain Petters organizations from approximately 1993 through on or about the date of his arrest by federal agents on October 3, 2008. Petters, through various entities that he controlled—including PCI and PL Ltd.—laundered what is estimated to be an amount in excess of $40 billion.

61.     On December 1, 2008, Petters was indicted by a Federal Grand Jury in the District of Minnesota (the "Indictment"). The Indictment charged Petters and PCI with mail and wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering, and charged Petters alone with money laundering, all in connection with the perpetration of, and resulting from

Petters' and PCI's participation in, the Ponzi scheme. On June 3, 2009, a Superseding Indictment was filed charging Petters and PCI with wire and mail fraud, conspiracy to commit mail and wire fraud, and money laundering conspiracy and charging Petters alone with money laundering, all in connection with Petters' and PCI's participation in the Ponzi scheme. On December 2, 2009, a jury in the District Court found Petters guilty of all 20 counts charged in the Superseding Indictment. On April 8, 2010, Judge Richard H. Kyle sentenced Petters to 50 years in prison for his crimes. On September 29, 2010, PCI and PGW each pleaded guilty to wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering.

62.     At various times during the course of the Ponzi scheme, Petters was assisted in the operation of the scheme by numerous individuals and conspirators, including Deanna Coleman ("Coleman"), Robert White ("White"), Larry Reynolds ("Reynolds"), Michael Catain ("Catain"), and James Wehmhoff ("Wehmhoff") (collectively referred to herein as "Associates"). Coleman has pleaded guilty to a single count of conspiracy to commit mail fraud. On September 2, 2010, Judge Richard H. Kyle sentenced Coleman to one year and one day of imprisonment for her crime. White has pleaded guilty to a single count of mail fraud. On September 15, 2010, Judge Richard H. Kyle sentenced White to five years imprisonment for his crime. Reynolds and Catain have each pleaded guilty to a single count of conspiracy to commit money laundering. On September 13, 2010, Judge Richard H. Kyle sentenced Catain to seven years and six months of imprisonment for his crime. On September 14, 2010, Judge Richard H. Kyle sentenced Reynolds to ten years and ten months of imprisonment for his crime. Wehmhoff has pleaded guilty to conspiracy to defraud the United States, conspiracy to commit tax evasion, and one count of aiding and assisting in the filing of a false tax return. He awaits sentencing for his role in the Ponzi scheme.

63.     Greg Bell ("Bell"), a managing director and former employee of Epsilon Management during a period of time relevant to the claims identified herein, pleaded guilty to wire fraud in relation to his involvement in the Petters Ponzi scheme through another business entity, Lancelot Investment Management. On September 30, the Honorable Richard H. Kyle sentenced Bell to sixty months of imprisonment.

64.     The scheme orchestrated by Petters and his Associates was a common species of fraud known as a Ponzi scheme. Petters, through a multitude of entities and with the assistance of his Associates, induced investors into financing the purchase of non-existent electronic equipment purportedly secured by fabricated purchase orders. Petters then took the funds invested by later investors and repaid initial investors not with the earnings from their investments, but with funds obtained from other investors. The payments were comprised of repayment of the principal amount invested (the "principal") and an amount that exceeded the amount invested (the "false profits").

65.     Petters, through PCI and a multitude of shell companies through which PCI operated—such as PL Ltd.—intended that the payments to early investors would induce ongoing, repeated, greater, and more widespread investment in the Ponzi scheme and thereby further perpetrate and extend the life of the fraud.

66.     By way of example, on or about October 31, 2001, Stafford—acting through Stevanovich—entered into a Master Loan Agreement (the "Loan Agreement") with PL Ltd. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit B**. Plaintiff acknowledges that certain documents attached as exhibits to this Complaint are not fully executed. Plaintiff's attached exhibits are provided as materials evidencing the course of dealing and transactions between the parties to this action. Under the Loan Agreement, the Epsilon Funds and the Westford Funds made funds available to PL Ltd. for the purpose of financing the accounts receivable that would result from the sale of purported

electronic goods. Each investment was evidenced by a promissory note. Under the Loan Agreement, PL Ltd. would make an investment proposal to Stevanovich and execute a note in favor of one of the Epsilon Funds and Westford Funds in order to receive funds. Stevanovich, primarily through Epsilon Global Master Fund I and Capital Strategies, invested in the Petters Ponzi scheme numerous times prior to entering into the Master Loan Agreement on October 31, 2001, with the initial zero coupon notes issued all resulting in a 48% rate of return on an annualized basis.

67. Pursuant to the Loan Agreement, PCI, acting through PL Ltd., would request that a global sum of funds be made available for investment from the Westford and Epsilon Funds pursuant to a Notice of Request for Loan executed by Tom Petters and addressed to Stafford Towne, Ltd. Attached hereto as **Exhibit C** is a demonstrative Notice of Request for Loan dated May 21, 2003, requesting that a loan in the amount of $20,000,000 be made pursuant to the Loan Agreement. Upon Stafford's receipt of a Notice of Request for Loan from Petters, PCI and/or PL Ltd., Stevanovich would then determine which funds he would utilize to respond to the request and would cause to be prepared separate notes for execution by Tom Petters in favor of whichever investment vehicle he would choose. For example, as demonstrated on **Exhibit C**, in response to a global loan request for $20,000,000, Stevanovich caused notes to be prepared and provided to Tom Petters for execution in the following amounts: a note in favor of Capital Strategies in the amount of $4,600,000; a note in favor of Westford Special Situations Fund LP in the amount of $199,070; a note in favor of Westford Special Situations Fund, Ltd. in the amount of $1,498,880; a note in favor of Epsilon Global Master Fund II in the amount of $10,012,050; and a note in favor of Epsilon Global Master Fund I in the amount of $6,323,400. Each note was issued at an annualized rate of return in the amount of 34.2%.

68. Pursuant to the Master Loan Agreement, the promissory notes were secured by a Security Agreement (the "Security Agreement") entered into by PL Ltd. and Stafford—on behalf of the Epsilon

22

and Westford Funds—on October 31, 2001. The Security Agreement provided Stafford, as agent of the various Epsilon and Westford Funds, with a security interest in PL Ltd. consisting of all accounts, books and records, chattel paper, contracts, copyrights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, all money, cash or cash equivalents, and all proceeds of the foregoing. A true and correct copy of the Security Agreement is attached hereto as **Exhibit D**. Pursuant to the Security Agreement, Stafford, as agent for the Westford and Epsilon Funds, was the secured party and all acknowledgments or correspondence relating to the security interest or UCC-1 Financing Statement were to be addressed to counsel for Stafford located in Minneapolis, Minnesota.

69.     In addition, pursuant to the Master Loan Agreement, as part of its transactions with the Epsilon and Westford Funds, PCI entered into an Assignment Agreement (the "Assignment Agreement") with PL Ltd. on October 31, 2001. Pursuant to the Assignment Agreement, PCI would assign its right, title, and interest in certain receivables backed by fabricated purchase orders to PL Ltd. A true and correct copy of the Assignment Agreement is attached hereto as **Exhibit E**.

70.     To assist PCI in its fictitious financing of what Petters and his Associates represented to be the acquisition of retail merchandise—and with the affirmative endorsement of the defendants and others—PCI formed a number of wholly-owned special-purpose entities ("SPE"). PL Ltd. was one of the several SPEs that Petters formed to operate the Ponzi scheme.

71.     Petters and his Associates told investors that funds paid to a specific SPE—such as PL Ltd.—were to be used to purchase inventory assets for resale, when in reality the funds were being funneled to PCI or other entities formed by Petters in order to pay earlier investors with funds received from later investors.

72.     To obtain investors in the Ponzi scheme, Petters portrayed PCI or the SPE as a middleman that purchased consumer electronic goods from wholesalers and resold the merchandise to large, "big box" retailers such as Costco, Sam's Club, and B.J.'s Wholesale Club. PCI and PL Ltd., through Petters and his Associates, intentionally fabricated the documents to recruit investors into the Ponzi scheme. Petters and his Associates prepared and utilized fabricated documents that were represented to investors to be equipment purchase orders and related documents. The fabricated documents included, but are not limited to (1) purchase orders from PCI to suppliers purportedly ordering electronic goods and (2) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PL Ltd. The purchase orders and the related documents were entirely fabricated by Petters and his Associates.

73.     Each SPE executed promissory notes in order to obtain funds to finance the acquisition of fictitious merchandise. The promissory notes were often personally guaranteed by Petters. Attached hereto as **<u>Exhibit F</u>** is a true and correct copy of a promissory note used by PL Ltd. to obtain funding from defendants.

74.     The fictitious merchandise was evidenced by fabricated equipment purchase orders in which the investors would purportedly acquire a security interest. Attached hereto as **<u>Exhibits G and H</u>** are true and correct copies of fabricated invoices and purchase orders of PL Ltd. and BJ's Wholesale Club.

75.     The high rates of return that were promised to investors promoted two essential goals of the Ponzi scheme: (1) to entice investors, such as defendants, to invest without employing reasonable due diligence in Petters, PCI, and PL Ltd.; and (2) to extend the life of the fraud and to enable Petters, PCI, and the SPEs to pay other earlier investors in the fraudulent scheme.

**B.      Petters and His Associates Used Middlemen to Conduct the Ponzi Scheme.**

76.      Petters and his Associates knew that investor funds, such as funds received by PL Ltd. from defendants, were ultimately going to be transferred to PCI to be used by Petters and PCI to conceal and disguise the nature, source, ownership, and control of the funds and to further the Ponzi scheme by paying amounts due to earlier investors. PCI and PL Ltd. did not purchase electronic goods with the funds defendants provided to them, but rather used the funds to pay off earlier investors who had amounts due, to financially prop up Petters' other businesses, and to fund Petters' lavish lifestyle.

77.      With respect to PCI's use of the SPEs, when investors wired funds into an SPE that was wholly owned by PCI, such as PL Ltd., these funds were often wired through middlemen whose role was to create the false and materially fraudulent appearance of acquiring the fictitious goods and then forward such funds, less a commission, to PCI.

78.      An illustration of how Petters systematically operated the Ponzi scheme through the SPEs of PCI is as follows:  Funds that were invested in the SPEs were generally transferred to either Nationwide International Resources, Inc. ("Nationwide") or Enchanted Family Buying Company ("Enchanted"). Nationwide is, and at all times relevant herein was, an entity owned and controlled by Reynolds and was used to conceal and disguise the nature, source, ownership, and control of funds used by Petters to further the Ponzi scheme. Enchanted is, and at all times relevant herein was, an entity owned and controlled by Catain and was used to conceal and disguise the nature, source, ownership, and control of funds used by Petters to further the Ponzi scheme.

79.      Petters and his Associates intended that Nationwide and Enchanted serve the role of the intermediary "suppliers" of the merchandise purportedly being acquired by PCI for resale.

80.     Petters engaged Catain, a Petters Associate, to open a bank account in the name of Enchanted in order to receive funds invested in PCI through its SPEs. Catain, as directed, would immediately redirect money to PCI after deducting a commission from the Enchanted bank account.

81.     Petters similarly engaged Reynolds, another Petters Associate, to receive investor funds into a bank account opened in the name of Nationwide. Reynolds, as instructed, would immediately redirect money to PCI after deducting commissions from the Nationwide bank account.

82.     After extracting commissions for their respective roles in the Ponzi scheme, Reynolds (through Nationwide) or Catain (through Enchanted) would transfer the funds to PCI, which would then transfer some or all of those funds back to the SPEs for repayment of Principal and earnings in the form of false profits and for the payment of additional funds to PCI.

**C.     PCI, Through Its Alter Ego, PL Ltd., Made Payments that were Fraudulent Transfers.**

83.     PCI would show a paper "profit" on each transaction because PCI's fabricated purchase order for the merchandise from the big box retailer was always for an amount greater than the amount of PCI's fabricated purchase order to Nationwide or Enchanted for the same nonexistent merchandise. Petters and his Associates—through PCI and PL Ltd.—created fictitious profits at will on each and every transaction by simply writing in the appropriate quantity and price information on the two sets of purchase orders to "produce" the necessary funds. For example, on July 20, 2005, PL Ltd. issued a Zero Coupon Receivable Participation Note (the "Note") to defendant Westford Special Situations Master Fund, L.P. in the amount of  $12,250,000 (with $13,475,000 due at Maturity). *See* **Exhibit F**. The amount of the Note was then transferred to Enchanted on that same date. Fabricated invoices and purchase orders were then produced by Petters, his Associates, and PCI showing that (a) PL Ltd. was purchasing electronics from Enchanted pursuant to three purchase orders at a total cost of $13,624,934

and (b) that BJ's Wholesale Club was purchasing these same electronics from PCI pursuant to three purchase orders at a total price of $15,668,609.90. *See* **Exhibits G and H**. PCI then assigned its interest in the fabricated BJ's Wholesale Club purchase orders to PL Ltd. pursuant to the Assignment Agreement. *See* **Exhibit E**. The next day, Enchanted transferred $17,531,500 to PCI. This amount relates to two wires to Enchanted: the wire from Petters Ltd. for the Note amount, plus a wire from Palm Beach Finance Holdings (another wholly-owned SPE of PCI) on a separate transaction. On December 1 and 2, 2005, PCI sent three wires to PL, Ltd. totaling $15,668,609.90. Defendants were then paid by PCI—through its alter-ego PL Ltd.—$1,370,502 in false profits and $12,250,000 in principal, leaving $2,048,107.12 in "profit" for PCI. Because no electronic goods ever existed in this transaction, and no sale actually occurred, the funds PL Ltd. transferred to defendants were obtained from other investors.

84. Because the transactions described in the fictitious purchase orders in fact did not exist, the only way PCI was able to transfer sufficient funds to the operative SPE was by money obtained from other investors; in other words, through the operation, control, and management of the Ponzi scheme by Petters and his Associates. Repayments of the Principal and "interest" in the form of false profits to these investors comprised a Ponzi scheme because they were primarily, if not exclusively, from funds invested by other PCI investors.

85. Petters and his Associates knowingly and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI and its SPEs from discovering the fraud.

86. Petters, as the owner, officer, and director of PCI, Petters Group Worldwide, LLC ("PGW"), and other debtor entities, was a fiduciary of these entities and had a duty to disclose the fraudulent activities alleged in this Complaint. Petters, in violation of his fiduciary duty, did not

disclose the fraudulent activities to current or prospective investors and other creditors of PCI, PGW, and other debtor entities.

87.     Petters—or Petters and his Associates—fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, PGW, and other debtor entities from discovering the fraud.

88.     The concealment of the fraud—whether by Petters' silence, the fraudulent and intentional concealment of the facts constituting the fraud, or the adverse domination of PCI, PGW, and other debtor entities by Petters and his Associates—prevented the discovery of the ongoing fraud until the Receiver was appointed and placed in control of the entities and the Receiver was able to discover facts constituting the fraud alleged in this Complaint.

89.     The Receiver acted diligently to discover facts constituting the fraud alleged in this Complaint.

90.     Any temporal limitations—statutory or otherwise—on the Trustee's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters and his Associates in fraudulently and intentionally concealing the fraud, and by the adverse domination of PCI, PGW, and other debtor entities by Petters and his Associates until the appointment of the Receiver.

## II.     PL LTD. AT ALL TIMES WAS, AND IS, AN ALTER EGO OF PCI

91.     At all times relevant herein, PCI operated PL Ltd. as an alter ego. PL Ltd. is an entity created and utilized by PCI as an SPE through which to funnel funds from defendants to PCI to further the Ponzi scheme and by which to route funds back to the defendants.

92.     PL Ltd. is, at all relevant times herein was, wholly owned by PCI. 100% of the membership interest in PL Ltd. is property of the bankruptcy estate of PCI, pursuant to section 541 of the Bankruptcy Code.

93.     Petters formed and operated PL Ltd. as one of PCI's SPEs for the sole purpose of receiving loan proceeds from investors such as the defendants, to further the Ponzi scheme.

94.     At all times relevant herein, PL Ltd. was nothing more than an instrumentality of PCI to further the Ponzi scheme and was used by PCI for the sole purpose of furthering the fraud orchestrated by Petters through the Ponzi scheme.

95.     Petters and his Associates at all times relevant herein knew that investor funds and accounts were commingled, used, and transferred by Petters and his Associates as necessary to further the Ponzi scheme. Funds that were intended for PL Ltd. were instead routed to PCI for subsequent distribution to other investors in other SPEs. For example, PCI would transmit misappropriated funds to its SPEs—including PL Ltd.—for ultimate payments to investors in furtherance of the fraud. Petters and his Associates caused monies received from PL Ltd. by the fictitious vendors of Nationwide and Enchanted to be rerouted and transferred directly to PCI accounts for the operations of PCI, repayment of investors, payment of false profits, and for Petters' personal use.

96.     Petters and his Associates expressly authorized and approved commingling of funds by and between numerous entities, such as between PCI and the SPEs. PL Ltd. was used solely as a conduit of funds ultimately destined for PCI to obtain funds and to repay defendants and other investors.  Funds generated by Petters through PL Ltd. were funneled to PCI, or to Petters individually, and were used by PCI and Petters to pay other investors. Similarly, funds transferred from PCI into PL Ltd. to pay defendants originated, in large part, from funds sourced from other investors.

97.     PCI maintained a number of bank accounts, including a bank account at M&I Bank. From 2001 to 2008, PCI transferred funds from its M&I bank account to the SPEs—including PL Ltd.—in the amount of approximately $32 billion. PCI also received approximately $7.2 billion from its SPEs. PCI's M&I bank account also received approximately $12.7 billion from Enchanted (owned by Catain, who plead guilty to conspiracy to commit money laundering) and approximately $12.1 billion from Nationwide (owned by Reynolds, who plead guilty to conspiracy to commit money laundering), co-conspirators in the money laundering scheme. This flow of funds illustrates that funds were routed through and around PL Ltd. to give the appearance of legitimate business activity and that PL Ltd., among other entities, was used as an artifice to perpetrate a massive financial fraud.

98.     PL Ltd. was never independently or sufficiently capitalized because PL Ltd. conducted little or no legitimate business operations and all funds provided to, or paid on behalf of, PL Ltd. were for the sole purpose of furthering the Ponzi scheme and were ultimately forwarded to PCI for distribution.

99.     PCI did not respect or treat PL Ltd. as a separate legal entity. For example, PL Ltd. had no functioning board or managers. Petters was PL Ltd.'s chief financial officer and chief executive officer; there were no other officers. On information and belief, there were no meetings of the board or managers, and no corporate minutes were maintained. PL Ltd. conducted little or no business activity other than the fraud.

100.    Petters directed certain of his Associates and PCI employees—including Coleman and White—to prepare fabricated transactional documents that PL Ltd. used to perpetuate the Ponzi scheme.

101.    Petters and his Associates dominated the business operations of PL Ltd. at all times relevant herein for the sole and exclusive purpose of furthering the Ponzi scheme that Petters orchestrated through PCI.

102.    At various times relevant to this Complaint, PCI and PL Ltd. shared the same corporate offices, including offices located at 4400 Baker Road, Minnetonka, MN 55343.

103.    PCI oversaw and directed all operations of PL Ltd.

104.    PCI and PL Ltd. did not maintain correct accounting records of their inter-company transfers and obligations.

105.    PCI caused PL Ltd. to enter into the investments with defendants, and in return PCI caused PL Ltd. to grant purported security interests to defendants to secure the purchase of fictitious goods backed by fabricated invoices.

106.    Petters conflated the multiple entities that he used to operate the Ponzi scheme by, among other things, transferring funds interchangeably among the entities, ultimately for the benefit of PCI and to generate the payment of false profits pursuant to the promissory notes to perpetrate and further the Ponzi scheme.

107.    Throughout the duration of the Ponzi scheme, PCI account statements reflect that Petters and his Associates caused at least $3.2 billion in PCI funds to be transferred into PL Ltd.—to the detriment of PCI's creditors—to be paid out to perpetrate the Ponzi scheme.

108.    The amount of funds provided to PL Ltd. to fund the fraudulent investment activities confirms that PL Ltd. was never capitalized to operate apart from, or independent of, PCI and that PL Ltd., in fact, had no existence separate and apart from PCI and the Ponzi scheme, as was well known to Petters and his Associates.

109.    Injustice, fundamental unfairness, and a violation of an established public policy against fraud would occur if PCI and PL Ltd.'s abuse of creating an artificial corporate veil to promote and perpetuate a fraud on the creditors and investors of PCI is allowed.

110. The artificial and fraudulent corporate entity of PL Ltd. must be reverse-pierced to reflect the true nature of the structure and operations of PL Ltd. as a mere alter ego of PCI at all times relevant herein, and the assets of PL Ltd. must be made available to the many creditors and victims of PCI.

111. For all the foregoing reasons, the Trustee seeks that this Court treat PL Ltd. and PCI as one entity for all purposes stated herein and with respect to all causes of action pleaded herein. The creditors of PCI would suffer great injustice if the assets of PL Ltd. are not made available to satisfy the debts of PCI, particularly since funds provided to Petters and PCI were not used for their intended purpose but were funneled to repay the defendants principal and false profits and thereby to promote and perpetuate a massive fraudulent scheme through the artifice of PL Ltd.

## III. FRAUDULENT TRANSFERS TO DEFENDANTS

112. Beginning on or about April 30, 2001, with the issuance of a $12,000,000 zero coupon note, and continuing through at least November 2, 2006, defendants transferred money to PL Ltd. and received in return PL Ltd.'s promissory notes. On information and belief, Stevanovich may have entered into investment transactions with the Petters Ponzi scheme earlier than April 30, 2001. In 2001, when Stevanovich first began investing in the Petters Ponzi scheme, the notes issued in favor of the respective Westford and Epsilon Funds accrued interest at the rate of 48% on an annualized basis.

113. During the course of the Ponzi scheme, defendants received distributions representing a return of the principal invested by defendants into the Ponzi scheme through purported investments secured by fictitious electronics transactions and also distributions representing false profits.

114. Pursuant to the fraudulent mechanisms set forth above—all of which were designed to funnel funds from defendants through PCI and back to defendants at exorbitant rates of return— defendants engaged in at least 344 separate note transactions with PL Ltd. in a principal sum of approximately $2,471,280,000.

115.    As a result of these note transactions, defendants received interest payments from PL Ltd. representing false profits of approximately $323,343,275 (the "False Profits").

116.    The Epsilon and Westford Funds—which includes the defendant entities—are, and at all times relevant to this Complaint were, owned, managed, and/or operated by Stevanovich.

117.    On information and belief, in each instance, every transaction entered into by the Epsilon and Westford Funds to invest in PCI and the Ponzi scheme—through PL Ltd.—was based upon wholly fraudulent and fictitious documents and financial transactions.

118.    Defendants knew or should have known that they were benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI, and PL Ltd. in connection with the Ponzi scheme. Defendants ignored numerous indicia of fraud from the general manner in which Petters, PCI, and PL Ltd. operated. Among other things, defendants were on actual notice of the following indicia of fraud and financial irregularity but failed to make sufficient inquiry:

    a.    Petters operated PCI and PL Ltd. without investor transparency. Petters generally declined to provide investors with audited financial statements. He also barred any communication by investors with retailers who Petters represented would be purchasing the fictitious electronics. Petters also routinely barred investors from viewing and inspecting the purported electronic goods they were financing. In fact, Bell specifically testified at Petters' criminal trial that auditors employed by Epsilon Management to conduct a review of PCI—prior to Epsilon Management initiating its first loan to PL Ltd.—were prohibited by PCI from contacting the alleged vendors or the alleged retailers of the goods to verify the existence of the purported inventory being financed or the existence of the transactions. Despite this obvious "red flag," Epsilon—under the control and authority of Stevanovich—proceeded to lend $12 million to PL Ltd. within weeks of receiving the auditors' report, which simply stated that

33

PCI's internal transaction records and documents matched wire transfers shown on PCI bank statements. However, the auditing firm could not—and did not—provide any assurances that the goods existed, and the report specifically qualified the firm's findings based on the limited scope of its review as directed by Epsilon Management. The report also noted that PCI records relied upon were not audited and specifically recommended that Epsilon Management require from PCI monthly financial statements prepared in accordance with generally accepted accounting principles as well as audited annual financial statements. On information and belief, Epsilon Management never demanded regular or audited financial statements from PCI or PL Ltd. throughout the duration of the financial relationship.

        b.       Petters, PCI, and PL Ltd. did not provide investors with electronic online access to their accounts which—had the investments been legitimate—would have shown important financial information regarding payments by bona fide retailers and shipments of electronics that was and is generally customary in the industry for purchase-order financing with large retailers.

        c.       PL Ltd. promised and produced returns that were too good to be true, reflecting a pattern of abnormally consistent and significant profitability that was not credible. Rates of return on funds advanced to PL Ltd. were commonly over 12-48% on an annualized basis. By comparison, the prime rate of interest ranged from 4% to 9% on an annual basis during the relevant time period. Attached hereto as **Exhibit I** is a graph comparing market interest rates during the relevant time period to the rate of False Profits charged by defendants.

        d.       Defendants received far higher annual rates of return on their purported investments with PL Ltd. than the interest rates PL Ltd. could have paid to commercial lenders during the relevant time period. *See* **Exhibit I**. On information and belief, defendants never questioned why Petters accepted their investments in lieu of other available and less expensive financing alternatives—

including commercial loans at far lower interest rates—which would have been more lucrative for Petters, PCI, and PL Ltd.

### A. PL Ltd. Transfers to Defendants

119. From in or about 2001 to the Petition Date, defendants were paid more than $3,203,439,988.09 by PL Ltd. (the "Transfers") resulting from at least 344 note transactions with PL Ltd. The Transfers consisted of substantial amounts of other investors' money that, instead of financing legitimate transactions, was used to pay prior investors, including defendants. Approximately $408,516,713.02 of the Transfers was ultimately paid or returned to PCI through PL Ltd., resulting in net transfers retained by defendants in the amount of $2,794,923,275.07. The Transfers were made to or for the benefit of defendants and include, but are not limited to, the Transfers listed on the documents attached hereto as **Exhibits J and K**.

120. On information and belief, additional transfers were made to or for the benefit of defendants beyond those identified in **Exhibits J and K**.

121. Of the Transfers, defendants received False Profits from PL Ltd. in the amount of approximately three hundred twenty-three million, three hundred forty-three thousand, two hundred seventy-five dollars ($323,343,275).

122. Of the Transfers, 19 transfers in the collective amount of approximately $85,579,924.85 (the "Two-Year Transfers") were made during the two years prior to the Petition Date. *See* **Exhibit J**.

123. To the extent that any of the recovery amounts may be inconsistent with each other, they are to be treated as being pled in the alternative.

124. During the course of this adversary proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to one or more defendants named in this Complaint. The Trustee intends to avoid and recover all transfers made by the Debtor of an interest of the Debtor in

property to or for the benefit of defendants or any other transferee. The Trustee reserves the right to amend this original Complaint to include: (i) further information regarding the transfers, (ii) additional transfers, (iii) modifications or revisions to the names of defendants, (iv) additional defendants, and (v) additional causes of action (i.e., but not exclusively, 11 U.S.C. §§ 542, 544, 545, 547, 548 and 549) (collectively, the "Amendments"), that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## COUNT I – TURNOVER AND ACCOUNTING

### [11 U.S.C. § 542]

### Against All Defendants

125.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

126.     The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code.

127.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from defendants of any and all Transfers made by PCI or PL Ltd., directly or indirectly, to defendants.

128.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by defendants from PCI or PL Ltd., directly or indirectly.

## COUNT II – FRAUDULENT TRANSFERS

## [Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551, and 1106]

### Against All Defendants Regarding the Two-Year Transfers

129.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

130.     The Two-Year Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Two-Year Transfers.

131.     The Two-Year Transfers were made to or for the benefit of defendants in furtherance of a fraudulent investment scheme.

132.     To the extent that defendants are not initial transferees of the Two-Year Transfers, they are immediate or mediate transferees of the initial transferees of the Two-Year Transfers and cannot satisfy their burden that they took the Two-Year Transfers for value, in good faith and without knowledge of the voidability of the Two-Year Transfers.

133.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551, and 1106: (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers in the amount of $85,579,924.85 from defendants for the benefit of the estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $85,579,924.85, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT III – FRAUDULENT TRANSFERS

## [Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106]

### Against All Defendants Regarding the Two-Year Transfers

134.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

135.     At all times material hereto, the Debtors: (a) were insolvent on the dates the Two-Year Transfers were made or became insolvent as a result of the Two-Year Transfers, and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Two-Year Transfers were effectuated constituted unreasonably small capital, and/or (c) at the time of the Two-Year Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

136.     The Debtors received less than a reasonably equivalent value in exchange for the Two-Year Transfers.

137.     To the extent that defendants are not initial transferees of the Two-Year Transfers, they are immediate or mediate transferees of the initial transferees o

138.     f the Two-Year Transfers and cannot satisfy their burden that they took the Two-Year Transfers for value, in good faith and without knowledge of the voidability of the Two-Year Transfers.

139.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551, and 1106: (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers in the amount of $85,579,924.85 from defendants for the benefit of the estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount

of 85,579,924.85, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT IV – FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

**Against All Defendants Regarding the Transfers**

140.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

141.    At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

142.    The Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay, or defraud a creditor to which the Debtors were or became indebted on or after the date of the Transfers.

143.    The Transfers were made to or for the benefit of defendants in furtherance of a fraudulent investment scheme.

144.    To the extent that defendants are not initial transferees of the Transfers, they are immediate or mediate transferees of the initial transferee of the Transfers and cannot satisfy their burden that they took the Transfers for value and in good faith.

145.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should

determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT V – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

### Against All Defendants Regarding the Transfers

146. The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

147. At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

148. At all times material hereto, the Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Transfers were effectuated constituted unreasonably small capital.

149. The Debtors received less than a reasonably equivalent value in exchange for the Transfers.

150.     To the extent that defendants are not initial transferees of the Transfers, they are immediate or mediate transferees of the initial transferees of the Transfers and cannot satisfy their burden that they took the Transfers for value and in good faith.

151.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT VI – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

### Against All Defendants Regarding the Transfers

152.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

153.     At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

154. At all times material hereto, the Debtors, at the time of the Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

155. The Debtors received less than a reasonably equivalent value in exchange for the Transfers.

156. To the extent that defendants are not initial transferees of the Transfers, they are immediate or mediate transferees of the initial transferees of the Transfers and cannot satisfy their burden that they took the Transfers for value and in good faith.

157. As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT VII – FRAUDULENT TRANSFERS

### [Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551, and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]

### Against All Defendants Regarding the Transfers

158. The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

159. At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtors that were and are allowable under Bankruptcy Code

§ 502 or that were and are not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

160.     At all times material hereto, the Debtors, at the time of the Transfers, were insolvent or, in the alternative, the Debtors became insolvent as a result of the Transfers.

161.     The Debtors received less than a reasonably equivalent value in exchange for the Transfers.

162.     To the extent that defendants are not initial transferees of the Transfers, they are immediate or mediate transferees of the initial transferees of the Transfers and cannot satisfy their burden that they took the Transfers for value and in good faith.

163.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants.

## COUNT VIII – LIEN AVOIDANCE

### [11 U.S.C. § 506(d)]

### Against All Defendants

164.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

165. To the extent that a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void in accordance with 11 U.S.C. § 506(d).

166. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to § 506(d) declaring and ordering that any lien asserted by defendants is invalid and void.

## COUNT IX – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT
### Against All Defendants

167. The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

168. At all times relevant hereto, all funds received by defendants were inextricably intertwined with the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI from other investors or participants in the Ponzi scheme.

169. Within the context of a Ponzi scheme, such as the one perpetrated through PCI utilizing the artificial corporate entity of PL Ltd., equality to defrauded creditors who lost principal based upon the Ponzi scheme is equity.

170. Defendants, as the recipients of fraudulently obtained proceeds of the Ponzi scheme— including the Principal and the False Profits—have no rightful or legitimate claim to any monies received from PCI through PL Ltd.

171. Defendants knowingly received monies from the Ponzi scheme, were unjustly enriched through their receipt of said fraudulently obtained monies to the detriment of other investors in PCI, and in equity and good conscience must be required to repay the proceeds received.

172. Defendants would be unjustly enriched to the extent they are allowed to retain the monies and proceeds received during their participation in the Ponzi scheme.

173.    Defendants must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Trustee to distribute equitably any such ill-gotten gains among all innocent participants, investors and creditors of PCI.

**WHEREFORE**, the Trustee respectfully requests this Court enter judgment in favor of plaintiffs and against defendants as follows:

A.      That as a matter of law and equity, at all times relevant hereto PL Ltd. was an alter ego of Debtor PCI, the very purpose of which was to defraud and hinder the detection of the Ponzi scheme by the creditors of PCI, and that as a result the Trustee is entitled to reverse-pierce PL Ltd.; that PCI and PL Ltd. be treated as one entity for all intents and purposes hereto, and that the assets of PL Ltd. be therefore made available to the creditors of PCI and the Trustee of PCI for all purposes;

B.      On Count I – pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code as against all defendants: (a) that the property that was the subject of the Fraudulent Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by defendants of the property that was the subject of the Transfers or the value of such property;

C.      On Count II – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551, and 1106 as against all defendants regarding the Two-Year Transfers:  (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers in the amount of $85,579,924.85 from defendants for the benefit of the estates of PCI and PL Ltd., (d) alternatively, recovering such False

45

Profits in the amount of $85,579,924.85, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

D.        On Count III – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 1106 as against all defendants regarding the Two-Year Transfers: (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers in the amount of $85,579,924.85 from defendants for the benefit of the estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $85,579,924.85 and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

E.        On Count IV – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against all defendants regarding the Transfers: a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

F.        On Count V – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the

fraudulent transfer laws of such other states as against all defendants regarding the Transfers: a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

G.     On Count VI – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against all defendants regarding the Transfers: (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

H.     On Count VII – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550(a), 551, and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states as against all defendants regarding the Transfers: (a) avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering such

Transfers in the amount of $3,203,439,988.09 from defendants for the benefit of the bankruptcy estates of PCI and PL Ltd., (d) alternatively, recovering such False Profits in the amount of $323,343,275, and (e) recovering prejudgment and post-judgment interest, attorneys' fees, and costs from defendants;

I.        On Count VIII – Lien Avoidance, pursuant to 11 U.S.C. § 506(d) as against all defendants: declaring and ordering that any lien asserted by defendants is invalid and void;

J.        On Count IX – Unjust Enrichment/Equitable Disgorgement as against all defendants: declaring and ordering that the Trustee shall recover the Principal and False Profits and any other monies received by defendants, directly or indirectly, from the fraud perpetrated through the Ponzi scheme for the benefit of the bankruptcy estates of the Debtors; and that defendants shall be liable to the bankruptcy estates of the Debtors in an amount equal to all monies received and shall be required to disgorge the same for the equitable distribution to all creditors of PCI;

K.        On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of PCI and PL Ltd.'s estate;

L.        On all Claims for Relief, assignment of defendants' income tax refunds from the United States, state, and local governments paid on fictitious profits during the course of the Ponzi scheme;

M.        Awarding the Trustee all applicable interest (including prejudgment and post-judgment interest), attorneys' fees, costs, and disbursements in this action; and

N.        Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

DATED:  October 8,  2010

**LINDQUIST & VENNUM P.L.L.P.**

By:  /s/ Mark D. Larsen

Daryle L. Uphoff (0111831)
Mark D. Larsen (318498)
James A. Lodoen (173605)
Kirstin D. Kanski (0346676)
Adam C. Ballinger (0389058)
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com
**ATTORNEYS FOR
DOUGLAS A. KELLEY
CHAPTER 11 TRUSTEE OF
PETTERS COMPANY, INC.
AND PL LTD., INC.**