# EXHIBIT C

## Notice of Request for Loan

Stafford Towne, Ltd.
7280 W. Palmetto Park Road
Boca Raton, Florida 33433

Attention: Ms. Camille Chee-Awai

The undersigned is the Borrower under that certain Master Loan Agreement, dated October 31, 2001 (as the same may be amended, modified or supplemented from time to time, herein called the "Agreement;" capitalized terms not otherwise defined herein being used as therein defined) among Petters Ltd., Inc. (the "Borrower"), the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent (the "Administrative Agent").

The Borrower hereby reaffirms all representations and warranties in the Agreement and certifies as follows:

(1)     That such representations and warranties shall be true and correct, as though made on the Closing Date both before and after giving effect to such Loan;

(2)     That no Default or Event of Default has occurred and is continuing; that the Loan shall be for the sole purpose of making payment on an invoice for merchandise being acquired for Borrower's inventory;

(3)     The proposed Closing Date of the Loan is May 21, 2003 and the amount of the Loan request is Twenty Million and 00/100 Dollars ($20,000,000);

(4)     Attached as Exhibit 1 is a complete copy (including all attachments and schedules) of the purchase order duly and validly issued by Borrower to each merchandise vendor that will be paid in part with the proceeds of the Loan;

(5)     Attached as Exhibit 2 is a complete copy (including all attachments and schedules) of the invoice for purchased merchandise issued to Borrower from each merchandise vendor that will be paid in part with the proceeds of the Loan;

(6)     The Borrower reaffirms that the merchandise vendor is not a Related Party of the Borrower or any Guarantor;

(7)     Set forth below are wire transfer instructions for direct payment of the Loan to the account of each merchandise vendor that will be paid in part with the proceeds of the Loan:

_____

_____

_____

_____

PCI-SW-034-001401

(8)     The location(s) of the merchandise to be purchased with the Loan, including street address and county are:

_____

_____

_____

(9)     The Borrower acknowledges that the amount of such Loan shall not exceed seventy percent (70%) of the Borrower's cost of merchandise to be purchased with such funds;

(10)    Attached as Exhibit 4 is a complete copy (including all attachments and schedules) of the purchase order(s) received by Borrower from its customer(s) pursuant to which Borrower is selling all merchandise to be purchased to such vendor; and

(11)    Upon its purchase by the Borrower, the merchandise will be Eligible Inventory.


PETTERS LTD., INC.

By _____
Title: _____


Each of the undersigned Guarantors acknowledges that the Note evidencing the Loan is guaranteed by the Guaranty dated October 31, 2001.


_____
Thomas J. Petters


Petters Company, Inc.

By _____
Its _____

PCI-SW-034-001402

**Exhibit A**

**Assignment Schedule**

This Assignment Schedule is made by PETTERS COMPANY, INC. ("Assignor") and PETTERS LTD., INC. ("Assignee") pursuant to the Assignment Agreement between them dated as of October 31, 2001. This Assignment Schedule is in addition to, and is not in substitution for, all other Assignment Schedules given under the Assignment Agreement. This particular Assignment Schedule documents the Inventory Sale assigned by Assignor to Assignee pursuant to the May 21, 2003 financing.

The following Inventory Sale is assigned by Assignor to Assignee:

| | |
|---|---|
| Buyer Name: | Sam's Club |
| Buyer Purchase Order No: | 9209646787 |
| | 9209646790 |
| | 9209646788 |
| | 9209646789 |

PETTERS COMPANY, INC.

By: _____
Its: _____
Dated: _____

PETTERS LTD., INC.

By: _____
Its: _____
Dated: _____

**Exhibit A**

**Assignment Schedule**

This Assignment Schedule is made by PETTERS COMPANY, INC. ("Assignor") and PETTERS LTD., INC. ("Assignee") pursuant to the Assignment Agreement between them dated as of October 31, 2001. This Assignment Schedule is in addition to, and is not in substitution for, all other Assignment Schedules given under the Assignment Agreement. This particular Assignment Schedule documents the Inventory Sale assigned by Assignor to Assignee pursuant to the May 21, 2003 financing.

The following Inventory Sale is assigned by Assignor to Assignee:

Buyer Name:              National Distributors

Buyer Purchase Order No:      00-222781
                              00-222780
                              00-222762
                              00-222759

PETTERS COMPANY, INC.

By: _____
Its: _____
Dated: _____

PETTERS LTD., INC.

By: _____
Its: _____
Dated: _____

1383993 v01 05/20/2003

PCI-SW-034-001404

# COSTCO RECEIVABLE PARTICIPATION NOTE

$4,600,000.00

Minneapolis, Minnesota
May 21, 2003

FOR VALUE RECEIVED, PETTERS LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Capital Strategies Fund, Ltd., or assigns (the "Lender"), to the account set forth below, the principal sum of FOUR MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Borrower promises also to pay on the Maturity Date interest on the unpaid principal amount hereof in like money at said office from the date funds are advanced hereunder until paid at the rate of two and eighty-five one hundredths percent (2.85%) per month.

The "Maturity Date" is defined as the first to occur of (1) November 21, 2003, or (2) the date that payments received by the Borrower on those certain Accounts arising from the sale of any Inventory purchased by Borrower in part with the proceeds of this Loan equal or exceed, when combined with all other payments on such Accounts, the unpaid principal and accrued interest on this Note.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement). This Note is subject to prepayment prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

In the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Maturity Date then the overdue principal of this Note shall thereafter bear interest at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. Interest on any overdue principal shall be payable upon demand. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise

PCI-SW-034-001405

payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

If an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may become or be declared to be due and payable in the manner and with the effect provided in the Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any) and interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

Chase Manhattan Bank, N.Y.
ABA# 021-000-021
F/A/O Goldman, Sachs & Co., N.Y.
A/C # 930-1-011483
F/F/C Capital Strategies Fund, Ltd.
A/C # 002-067841

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

**PETTERS LTD., INC.,**
**a Minnesota corporation**

By _____
Thomas J. Petters, President

[Signature Page to Promissory Note]

1383744 v01 05/20/2003

PCI-SW-034-001407

## ZERO COUPON
## WAL-MART RECEIVABLE PARTICIPATION NOTE

Principal Amount       Original Issue Date: May 21, 2003
 Due at Maturity: $199,070.00     Minneapolis, Minnesota

  FOR VALUE RECEIVED, PETTERS LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Westford Special Situations Fund LP, or assigns (the "Lender"), to the account set forth below, the principal sum of ONE HUNDRED NINETY NINE THOUSAND SEVENTY AND 00/100 DOLLARS on the Maturity Date (as defined below).

  The Maturity Date is November 21, 2003.

  The principal of this Note shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Maturity Date then the overdue principal of this Note shall thereafter bear interest at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. Interest on any overdue principal shall be payable upon demand. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

  This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement).

  The principal amount of this Note due at Maturity may be prepaid in full at any time, without premium or penalty.

  If an Event of Default with respect to this Note shall occur and be continuing, the Principal Amount Due at Maturity (as set forth above) may be declared due and payable in the manner and with the effect provided in the Agreement. Upon payment (i) of the amount of principal so declared due and payable and (ii) of interest on any overdue principal and overdue

PCI-SW-034-001408

interest (in each case to the extent that the payment of such interest shall be legally enforceable), all of the Borrower's obligations in respect of the payment of the principal of and interest, if any, on this Note shall terminate.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any) and interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

> Chase Manhattan Bank, N.Y.
> ABA # 021-000-021
> F/A/O Goldman Sachs & Co, N.Y.
> A/C# 930-1-011483
> F/F/C Westford Special Situations Fund LP
> A/C# 002-030146

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

2

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

PETTERS LTD., INC.,
a Minnesota corporation

By _____
Thomas J. Petters, President

**[Signature Page to Zero Coupon Promissory Note]**

3

PCI-SW-034-001410

## ZERO COUPON
## WAL-MART RECEIVABLE PARTICIPATION NOTE

Principal Amount                                      Original Issue Date: May 21, 2003
Due at Maturity: $1,498,880.00                        Minneapolis, Minnesota

FOR VALUE RECEIVED, PETTERS LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Westford Special Situations Fund Ltd., or assigns (the "Lender"), to the account set forth below, the principal sum of ONE MILLION FOUR HUNDRED NINETY EIGHT THOUSAND EIGHT HUNDRED EIGHTY AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Maturity Date is November 21, 2003.

The principal of this Note shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Maturity Date then the overdue principal of this Note shall thereafter bear interest at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. Interest on any overdue principal shall be payable upon demand. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement).

The principal amount of this Note due at Maturity may be prepaid in full at any time, without premium or penalty.

If an Event of Default with respect to this Note shall occur and be continuing, the Principal Amount Due at Maturity (as set forth above) may be declared due and payable in the manner and with the effect provided in the Agreement. Upon payment (i) of the amount of

principal so declared due and payable and (ii) of interest on any overdue principal and overdue interest (in each case to the extent that the payment of such interest shall be legally enforceable), all of the Borrower's obligations in respect of the payment of the principal of and interest, if any, on this Note shall terminate.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any) and interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

> Chase Manhattan Bank, N.Y.
> ABA # 021-000-021
> F/A/O Goldman Sachs & Co, N.Y.
> A/C# 930-1-011483
> F/F/C Westford Special Situations Fund Ltd.
> A/C# 002-075836

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

2

PCI-SW-034-001412

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

PETTERS LTD., INC.,
a Minnesota corporation

By _____
Thomas J. Petters, President

**[Signature Page to Zero Coupon Promissory Note]**

3

1383740 v01 05/20/2003

PCI-SW-034-001413

## ZERO COUPON
## WAL-MART RECEIVABLE PARTICIPATION NOTE

Principal Amount                                Original Issue Date: May 21, 2003
  Due at Maturity: $10,012,050.00                    Minneapolis, Minnesota

FOR VALUE RECEIVED, PETTERS LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Epsilon Global Master Fund II, L.P., or assigns (the "Lender"), to the account set forth below, the principal sum of TEN MILLION TWELVE THOUSAND FIFTY AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Maturity Date is November 21, 2003.

The principal of this Note shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Maturity Date then the overdue principal of this Note shall thereafter bear interest at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. Interest on any overdue principal shall be payable upon demand. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement).

The principal amount of this Note due at Maturity may be prepaid in full at any time, without premium or penalty.

If an Event of Default with respect to this Note shall occur and be continuing, the Principal Amount Due at Maturity (as set forth above) may be declared due and payable in the

manner and with the effect provided in the Agreement. Upon payment (i) of the amount of principal so declared due and payable and (ii) of interest on any overdue principal and overdue interest (in each case to the extent that the payment of such interest shall be legally enforceable), all of the Borrower's obligations in respect of the payment of the principal of and interest, if any, on this Note shall terminate.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any) and interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

> Chase Manhattan Bank, N.Y.
> ABA # 021-000-021
> F/A/O Goldman Sachs & Co, N.Y.
> A/C# 930-1-011483
> F/F/C Epsilon Global Master Fund II, L.P.
> A/C# 002-087302

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

PETTERS LTD., INC.,
a Minnesota corporation

By _____
Thomas J. Petters, President

**[Signature Page to Zero Coupon Promissory Note]**

1383737 v01 05/20/2003

PCI-SW-034-001416

## ZERO COUPON
### COSTCO RECEIVABLE PARTICIPATION NOTE

Principal Amount                                 Original Issue Date: May 21, 2003
  Due at Maturity: $6,323,400.00                           Minneapolis, Minnesota

FOR VALUE RECEIVED, PETTERS LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Epsilon Global Master Fund, L.P., or assigns (the "Lender"), to the account set forth below, the principal sum of SIX MILLION THREE HUNDRED TWENTY THREE THOUSAND FOUR HUNDRED AND 00/100 DOLLARS on the Maturity Date (as defined below).

The Maturity Date is November 21, 2003.

The principal of this Note shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or repayment or at the Maturity Date, and in such case the overdue principal of this Note shall bear interest at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Maturity Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Maturity Date then the overdue principal of this Note shall thereafter bear interest at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. Interest on any overdue principal shall be payable upon demand. Any such interest on any overdue principal that is not so paid on demand shall bear interest at the same rate as the interest on the overdue principal (to the extent that the payment of such interest shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such interest has been made or duly provided for, and such interest shall also be payable upon demand. In the event that the Maturity Date is not a Business Day, the principal otherwise payable on such Maturity Date will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date.

This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement).

The principal amount of this Note due at Maturity may be prepaid in full at any time, without premium or penalty.

If an Event of Default with respect to this Note shall occur and be continuing, the Principal Amount Due at Maturity (as set forth above) may be declared due and payable in the manner and with the effect provided in the Agreement. Upon payment (i) of the amount of

principal so declared due and payable and (ii) of interest on any overdue principal and overdue interest (in each case to the extent that the payment of such interest shall be legally enforceable), all of the Borrower's obligations in respect of the payment of the principal of and interest, if any, on this Note shall terminate.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any) and interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of and interest, if any, on this Note due on the Maturity Date will be made in immediately available funds on the Maturity Date (whether or not this Note has been presented), with such funds transferred by wire to the following account:

> Chase Manhattan Bank, N.Y.
> ABA # 021-000-021
> F/A/O Goldman, Sachs & Co., N.Y.
> A/C# 930-1-011483
> F/F/C Epsilon Global Master Fund, L.P.
> A/C# 002069920

or such other account or place as the Administrative Agent shall direct the Borrower in writing.

2

PCI-SW-034-001418

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

**PETTERS LTD., INC.,**
**a Minnesota corporation**

By

Thomas J. Petters, President

**[Signature Page to Zero Coupon Promissory Note]**

3

1383732 v01 05/20/2003

PCI-SW-034-001419

# EXHIBIT D

# AMENDED AND RESTATED
## SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (the "Agreement"), dated and effective as of this 31st day of October, 2001, is made by PETTERS LTD., INC., a Minnesota corporation, with its chief executive office located at 7585 Equitable Drive, Eden Prairie, Minnesota (hereinafter called the "Debtor"), in favor of STAFFORD TOWNE, LTD., as agent, with an office at 7280 W. Palmetto Park Road, Boca Raton, Florida 33433 (the "Secured Party"), for the benefit of the Lenders party, from time to time, to that certain Master Loan Agreement, dated of even date herewith (the "Lenders"), entered among Debtor, Stafford Towne, Ltd., as Administrative Agent, and the Lenders (the Master Loan Agreement as it may be amended, modified, supplemented, increased, or restated from time to time being the "Master Loan Agreement").

## RECITALS

A.    The Debtor entered into a Security Agreement, dated as of April 30, 2001 (the "Previous Security Agreement") in which the Debtor granted to the Secured Party a security interest in certain personal property of the Debtor.

B.    The Debtor and the Secured Party have mutually agreed that it is in the interests of both parties to amend and restate the Previous Security Agreement to designate the Notes, as defined in the Master Loan Agreement (the "Notes"), as Obligations of the Debtor secured hereby.

C.    Debtor has determined that the execution, delivery, and performance of this Agreement is in its best business and pecuniary interest.

THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor hereby agrees that the Previous Security Agreement shall be amended and restated in its entirety as follows:

## ARTICLE I
## DEFINITIONS

As used herein, the following terms shall have the meanings set forth in this Section. Other terms defined herein shall have the meanings ascribed to them herein. All capitalized terms used herein not specifically defined herein shall have the meaning ascribed to them in the Master Loan Agreement.

"Accounts" shall have the meaning provided in Article 9.

"Article 9" shall mean Article 9 of the UCC.

"Chattel Paper" shall have the meaning provided in Article 9 and shall include, without limitation, all Electronic Chattel Paper and Tangible Chattel Paper.

"Collateral" shall mean all property in which a security interest is granted hereunder.

"Commercial Tort Claim" shall have the meaning provided in Article 9.

"Controlled Property" shall mean property of every kind and description in which Debtor has or may acquire any interest, now or hereafter at any time in the possession or control of Secured Party for any reason and all dividends and distributions on or other rights in connection with such property.

"Data Processing Records and Systems" shall mean all of Debtor's now existing or hereafter acquired electronic data processing and computer records, software (including, without limitation, all "Software" as defined in Article 9), systems, manuals, procedures, disks, tapes and all other storage media and memory.

"Default" shall mean any event which if it continued uncured would, with notice or lapse of time or both, constitute an Event of Default.

"Deposit Accounts" shall have the meaning provided in Article 9 and shall include, without limitation, any demand, time, savings, passbook or similar account maintained with a bank.

"Document" shall have the meaning provided in Article 9.

"Electronic Chattel Paper" shall have the meaning provided in Article 9.

"Equipment" shall have the meaning provided in Article 9.

"Event of Default" shall have the meaning specified in Article VI hereof.

"Fixtures" shall have the meaning provided in Article 9.

"General Intangibles" shall have the meaning provided in Article 9 and shall include, without limitation, all Payment Intangibles.

"Goods" shall have the meaning provided in Article 9.

"Debtor" shall have the meaning set forth in the preamble hereto.

"Instruments" shall have the meaning provided in Article 9.

"Insurance Proceeds" shall mean all proceeds of any and all insurance policies payable to Debtor with respect to any Collateral, or on behalf of any Collateral, whether or not such policies are issued to or owned by Debtor.

"Inventory" shall have the meaning provided in Article 9.

"Investment Property" shall have the meaning provided in the UCC.

"Lender" shall have the meaning set forth in the preamble hereto.

"Letter of Credit Rights " shall have the meaning provided in Article 9.

"Master Loan Agreement" shall have the meaning set forth in the recitals hereto.

2

PCI-SW-049-001571

"Payment Intangibles" shall have the meaning provided in Article 9.

"Proceeds" shall have the meaning provided in Article 9.

"Products" shall mean any goods now or hereafter manufactured, processed or assembled with any of the Collateral.

"Supporting Obligations" shall have the meaning provided in Article 9.

"Tangible Chattel Paper" shall have the meaning provided in Article 9.

"UCC" shall mean the Uniform Commercial Code as enacted in the State of Minnesota, as amended from time to time.

## ARTICLE II
## SECURITY INTERESTS

As security for the payment of each and every debt, liability and obligation of every type and description which Borrower may now or at any time owe to the Lenders, whether now existing or hereafter arising, direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, independent, joint, several or joint and several and interest accrued on any of the foregoing, both before and after the filing of a bankruptcy petition by or against the Borrower, including obligations under the Master Loan Agreement (including all Prior Notes, as defined therein) and pursuant to the Notes (the "Obligations"), Debtor hereby grants to Secured Party a security interest in all of Debtor's now owned or hereafter acquired or arising:

> Accounts;
> Chattel Paper;
> Commercial Tort Claims, if any, described on Exhibit B attached hereto and
> incorporated herein by reference;
> Controlled Property;
> Deposit Accounts;
> Documents;
> Equipment and Fixtures;
> General Intangibles;
> Instruments;
> Inventory;
> Investment Property;
> Letter of Credit Rights;
> Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-
> cash Proceeds of all types);
> Products of all the foregoing; and
> Supporting Obligations.

3

PCI-SW-049-001572

# ARTICLE III
## REPRESENTATIONS AND COVENANTS OF DEBTOR

Debtor represents, warrants and covenants that:

3.1     Authorization.  The execution and performance of this Agreement have been duly authorized by all necessary action and do not and will not: (a) require any consent or approval of the stockholders of any entity, or the consent of any governmental entity; or (b) violate any provision of any indenture, contract, agreement or instrument to which it is a party or by which it is bound.

3.2     Title to Collateral.  Debtor has good and marketable title to all of the Collateral and none of the Collateral is subject to any security interest except for the security interest created pursuant to this Agreement or other security interests permitted by the Master Loan Agreement (such other security interests being "Permitted Liens").

3.3     Disposition or Encumbrance of Collateral.  Debtor will not encumber, sell or otherwise transfer or dispose of the Collateral without the prior written consent of Secured Party except as provided in this paragraph or for Permitted Liens.  Until a Default or Event of Default has occurred and is continuing, Debtor may sell Collateral consisting of: (a) Inventory in the ordinary course of business provided that Debtor receives as consideration for such sale an amount not less than the fair market value of the Inventory at the time of such sale; and (b) Equipment and Fixtures which in the judgment of Debtor have become obsolete or unusable in the ordinary course of business, provided that all net Proceeds of such sales of Equipment and Fixtures are delivered directly to Secured Party for application to the Obligations in such order as the Secured Party may elect.

3.4     Validity of Accounts.  Debtor warrants that all Collateral consisting of Accounts, Chattel Paper and Instruments included in Debtor's schedules, financial statements or books and records are bona fide existing obligations created by the sale and actual delivery of Inventory or the rendition of services to customers in the ordinary course of business, which Debtor then owns free and clear of any security interest other than the security interest created by this Agreement or other Permitted Liens and which are then unconditionally owing to Debtor without defenses, offset or counterclaim except those arising in the ordinary course of business that are immaterial in the aggregate and that the unpaid principal amount of any such Chattel Paper or Instrument and any security therefor is and will be as represented to Secured Party on the date of the delivery thereof to Secured Party.

3.5     Maintenance of Tangible Collateral.  Debtor will maintain the tangible Collateral in good condition and repair.  At the time of attachment and perfection of the security interest granted pursuant hereto and thereafter, all tangible Collateral will be located and will be maintained only at the locations set forth on Exhibit A hereto.  Except as otherwise permitted by Section 3.3, Debtor will not remove such Collateral from such locations unless, prior to any such removal, Debtor has given written notice to Secured Party of the location or locations to which Debtor desires to remove the Collateral, Secured Party has given its written consent to such removal, and Debtor has delivered to Secured Party acknowledgment copies of financing statements filed where appropriate to continue the perfection of Secured Party's security interest as a first priority security interest therein.  Secured Party's security interest attaches to all of the Collateral wherever located and Debtor's failure to inform Secured Party of the location of any item or items of Collateral shall not impair Secured

4

Party's security interest therein. Debtor hereby authorizes Secured Party to file the financing statement in the form set forth in Exhibit B.

3.6  Notation on Chattel Paper. For purposes of the security interest granted pursuant to this Agreement, Secured Party has been granted a direct security interest in all Chattel Paper constituting part of the Collateral and such Chattel Paper is not claimed merely as Proceeds of Inventory. Upon Secured Party's request, Debtor will deliver to Secured Party the original of all Chattel Paper. Debtor will not execute any copies of such Chattel Paper constituting part of the Collateral other than those which are clearly marked as a copy. Secured Party may stamp any such Chattel Paper with a legend reflecting Secured Party's security interest therein.

3.7  Instruments as Proceeds; Deposit Accounts. Notwithstanding any other provision in this Agreement concerning Instruments, Debtor covenants that Instruments constituting cash Proceeds (for example, money and checks) shall be deposited in the Depository Accounts with the Depository Bank containing only Proceeds. Debtor, for purposes of the security interest granted pursuant to this Agreement, has granted to the Secured Party a direct security interest in all Deposit Accounts constituting part of the Collateral and such Deposit Accounts are not claimed merely as Proceeds of other Collateral.

3.8  Protection of Collateral. All expenses of protecting, storing, warehousing, insuring, handling and shipping of the Collateral, all costs of keeping the Collateral free of any liens, encumbrances and security interests prohibited by this Agreement and of removing the same if they should arise, and any and all excise, property, sales and use taxes imposed by any state, federal or local authority on any of the Collateral or in respect of the sale thereof, shall be borne and paid by Debtor and if Debtor fails to promptly pay any thereof when due, Secured Party may, at its option, but shall not be required to pay the same whereupon the same shall constitute Obligations and shall bear interest at the highest Default Rate specified in the Notes (the "Interest Rate") and shall be secured by the security interest granted hereunder.

3.9  Insurance. Debtor will procure and maintain, or cause to be procured and maintained, insurance issued by responsible insurance companies insuring the Collateral against damage and loss by theft, fire, collision (in the case of motor vehicles), and such other risks as are usually carried by owners of similar properties or as may be requested by Secured Party in an amount equal to the replacement value thereof, and, in any event, in an amount sufficient to avoid the application of any co-insurance provisions and payable, in the case of any loss in excess of $10,000.00, to Debtor and Secured Party jointly. All such insurance shall contain an agreement by the insurer to provide Secured Party with 30 days' prior notice of cancellation and an agreement that the interest of Secured Party shall not be impaired or invalidated by any act or neglect of Debtor nor by the occupation of the premises wherein such Collateral is located for purposes more hazardous than are permitted by said policy. Debtor will maintain, with financially sound and reputable insurers, insurance with respect to its properties and business against such casualties and contingencies of such types (which may include, without limitation, public and product liability, larceny, embezzlement, business interruption or other criminal misappropriation insurance) and in such amounts as may from time to time be required by Secured Party. Debtor will deliver evidence of such insurance and the policies of insurance or copies thereof to Secured Party upon request.

3.10  Compliance with Law. Debtor will not use the Collateral, or knowingly permit the Collateral to be used, for any unlawful purpose or in violation of any federal, state or municipal law.

5

3.11   Books and Records; Access.

(a)     Debtor will permit Secured Party and its representatives to examine Debtor's books and records (including Data Processing Records and Systems) with respect to the Collateral and make extracts therefrom and copies thereof at any time and from time to time, and Debtor will furnish such information and reports to Secured Party and its representatives regarding the Collateral as Secured Party and its representatives may from time to time request.   Debtor will also permit Secured Party and its representatives to inspect the Collateral at any time and from time to time as Secured Party and its representatives may request.

(b)     Secured Party shall have authority, at any time, to place, or require Debtor to place, upon Debtor's books and records relating to Accounts, Chattel Paper and other rights to payment covered by the security interest granted hereby a notation or legend stating that such Accounts, Chattel Paper and other rights to payment are subject to Secured Party's security interest.

3.12   Notice of Default.  Immediately upon any officer of Debtor becoming aware of the existence of any Default or Event of Default, Debtor will give notice to Secured Party that such Default or Event of Default exists, stating the nature thereof, the period of existence thereof, and what action Debtor proposes to take with respect thereto.

3.13   Additional Documentation.  Debtor will execute, from time to time, and authorizes Secured Party to execute from time to time as Debtor's attorney-in-fact, such financing statements, assignments, and other documents covering the Collateral, including Proceeds, as Secured Party may reasonably request in order to create, evidence, perfect, maintain or continue its security interest in the Collateral (including additional Collateral acquired by Debtor after the date hereof), and Debtor will pay the cost of filing the same in all public offices in which Secured Party may deem filing to be appropriate and will notify Secured Party promptly upon acquiring any additional Collateral that may require an additional filing.   Upon request, Debtor will deliver to Secured Party all Debtor's Documents, Chattel Paper and Instruments constituting part of the Collateral.

3.14   Chief Executive Office; State of Incorporation.  The location of the chief executive office of Debtor is located in the State set forth in the preamble hereto and will not be changed from such state without 30 days' prior written notice to Secured Party.  Debtor warrants that its books and records concerning Accounts and Chattel Paper constituting part of the Collateral are located at its chief executive office.  Debtor's State of organization is the State set forth in the preamble hereto and such State has been its State of organization since the date of Debtor's organization. Debtor will not change its State of organization from such State without 30 days' prior written notice to Secured Party, Secured Party has given its written consent to such change, and Debtor has delivered to Secured Party acknowledgment copies of financing statements filed where appropriate to continue the perfection of Secured Party's security interest as a first priority security interest therein.

3.15   Name of Debtor.  Debtor's exact legal name and type of legal entity is as set forth in the preamble hereto.  Debtor has not used any other name within the past five years except those described on Exhibit A attached hereto.  Neither Debtor nor, to Debtor's knowledge, any predecessor in title to any of the Collateral has executed any financing statements or security agreements presently effective as to the Collateral except those described on Exhibit A attached hereto.

6

PCI-SW-049-001575

3.16  Disputes; etc. Debtor shall advise Secured Party promptly of Inventory in excess of $10,000.00 for any one customer in any fiscal year or in excess of $25,000.00 in the aggregate for all customers in any fiscal year which are returned by a customer(s) or otherwise recovered from such customer(s) and unless instructed to deliver such Inventory to Secured Party, Debtor shall resell such Inventory for Secured Party and assign or deliver to Secured Party the resulting Accounts or other Proceeds. Debtor shall also advise Secured Party promptly of all disputes and claims in excess of $10,000.00 for any one obligor on the Collateral in any fiscal year or in excess of $25,000.00 in the aggregate for all obligors in any fiscal year and settle or adjust them at no expense to Secured Party. After the occurrence and during the continuance of an Event of Default, Secured Party may at all times settle or adjust such disputes and claims directly with the customers for amounts and upon terms which Secured Party considers commercially reasonable. No discount, credit or allowance shall be granted by Debtor to any customer without Secured Party's written consent other than discounts, credits, allowances, adjustments and returns made or granted by Debtor in the ordinary course of business.

3.17  Power of Attorney. Debtor appoints Secured Party, or any other person whom Secured Party may from time to time designate, as Debtor's attorney with power, to: (a) endorse Debtor's name on any checks, notes, acceptances, drafts or other forms of payment or security evidencing or relating to any Collateral that may come into Secured Party's possession; (b) sign Debtor's name on any invoice or bill of lading relating to any Collateral, on drafts against customers, on schedules and confirmatory assignments of Accounts, Chattel Paper, Documents or other Collateral, on notices of assignment, financing statements under the UCC and other public records, on verifications of accounts and on notices to customers; (c) notify the post office authorities to change the address for delivery of Debtor's mail to an address designated by Secured Party; (d) receive and open all mail addressed to Debtor; (e) send requests for verification of Accounts, Chattel Paper, Instruments or other Collateral to customers; and (f) do all things necessary to carry out this Agreement; provided, however, that so long as no Event of Default has occurred and is continuing, Secured Party shall not exercise the powers granted pursuant to Section 3.17(c) or (d). Debtor ratifies and approves all acts of the attorney taken within the scope of the authority granted. Neither Secured Party nor the attorney will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law, except for its willful misconduct or gross negligence. This power, being coupled with an interest, is irrevocable so long as any Obligation remains unpaid. Debtor waives presentment and protest of all instruments and notice thereof, notice of default and dishonor and all other notices to which Debtor may otherwise be entitled.

3.18  Patents and Trademarks; Etc. Debtor agrees with Secured Party that, until the security interest granted by this Agreement has been terminated in accordance with the terms hereof:

(a)  Debtor will perform all acts and execute all documents including, without limitation, grants of security interest, in form suitable for filing with the United States Patent and Trademark Office, reasonably requested by Secured Party at any time to evidence, perfect, maintain, record and enforce Secured Party's interest in the Collateral comprised of patents (collectively the "Patents"), patent applications (collectively the "Patent Applications"), trademarks or service marks (collectively the "Trademarks") or of any applications therefor (collectively the "Trademark Applications") or otherwise in furtherance of the provisions of this Agreement;

(b)  Except to the extent that Secured Party shall consent in writing, Debtor (either itself or through licensees) will, unless Debtor shall reasonably determine that a Trademark

7

(or the use of a Trademark in connection with a particular class of goods or products) is not of material economic value to Debtor. (i) continue to use each Trademark on each and every trademark class of goods in order to maintain each Trademark in full force free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under each Trademark, (iii) employ each Trademark with the appropriate notice of application or registration to the extent required by applicable law to maintain such Trademark, (iv) not use any Trademark except for the uses for which registration or application for registration of such Trademark has been made, unless such use is otherwise lawful, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated;

(c)     Except to the extent that Secured Party shall consent in writing, Debtor will not, unless Debtor shall reasonably determine that a Patent is not of material economic value to Debtor, do any act, or not to do any act, whereby any Patent may become abandoned or dedicated;

(d)     Unless Debtor shall reasonably determine that a Patent, Patent Application, Trademark or Trademark Application is not of material economic value to Debtor, Debtor shall notify Secured Party immediately if it knows, or has reason to know, of any reason that any Patent, Patent Application, Trademark or Trademark Application may become abandoned or dedicated, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office or any court) regarding Debtor's ownership of any Patent or Trademark, its rights to register the same, or to keep and maintain the same;

(e)     If Debtor, either itself or through any agent, employee, licensee or designee, shall file a Patent Application or Trademark Application for the registration of any Trademark with the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, Debtor shall promptly inform Secured Party, and, upon request of Secured Party, shall promptly execute and deliver any and all agreements, instruments, documents and papers as Secured Party may reasonably request to evidence Secured Party's security interest in such Patent or Trademark and the goodwill and general intangibles of Debtor relating thereto or represented thereby;

(f)     Unless Debtor shall reasonably determine that a Patent Application or Trademark Application is not of material economic value to Debtor, Debtor will take all necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each Patent Application and Trademark Application (and to obtain the relevant registration) and to maintain each registration of the Patents and Trademarks including, without limitation, filing of applications for renewal and affidavits of use;

(g)     Unless Debtor shall reasonably determine that a Patent or Trademark is not of material economic value to Debtor, Debtor shall promptly notify Secured Party if any Patent or Trademark is infringed, misappropriated or diluted by a third party and either shall promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, or take such other actions as

8

PCI-SW-049-001577

Debtor shall reasonably deem appropriate under the circumstances to protect such Patent or Trademark; and

(h)     Debtor agrees that it will not enter into any agreement (for example, a license agreement) which is inconsistent with Debtor's obligations under this Agreement.

3.19   <u>Copyrights</u>.  Debtor agrees with Secured Party that, until the security interest granted by this Agreement has been terminated in accordance with the terms hereof:

(a)     Debtor will perform all acts and execute all documents including, without limitation, grants of security interest, in form suitable for filing with the United States Copyright Office, reasonably requested by Secured Party at any time to evidence, perfect, maintain, record and enforce Secured Party's interest in the Collateral comprised of copyrights or copyright applications (collectively the "Copyrights") or otherwise in furtherance of the provisions of this Agreement;

(b)     Except to the extent that the Secured Party shall consent in writing, Debtor (either itself or through licensees) will, unless Debtor shall reasonably determine that a Copyright is not of material economic value to Debtor, publish the materials for which a Copyright has been obtained (the "Works") with any notice of copyright registration required by applicable law to preserve the Copyright;

(c)     Unless Debtor shall reasonably determine that a Copyright is not of material economic value to Debtor, Debtor shall notify the Secured Party immediately if it knows, or has reason to know, of any reason that any application or registration relating to any Copyright may become abandoned or dedicated or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Copyright Office or any court) regarding Debtor's ownership of any Copyright, its right to register the same, or to keep and maintain the same;

(d)     If Debtor, either itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Copyright with the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, Debtor shall promptly inform Secured Party, and, upon request of Secured Party, execute and deliver any and all agreements, instruments, documents and papers as Secured Party may request to evidence Secured Party's security interest in such Copyright and the Works relating thereto or represented thereby;

(e)     Unless Debtor shall reasonably determine that a Copyright is not of material economic value to Debtor, Debtor will take all commercially reasonable steps, including, without limitation, in any proceeding before the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the Copyrights;

(f)     In the event that any Copyright is infringed by a third party, Debtor shall promptly notify Secured Party and shall, unless Debtor shall reasonably determine that such Copyright is not of material economic value to Debtor, promptly sue to recover any and all

9

damages or take such other actions as Debtor shall reasonably deem appropriate under the circumstances to protect such Copyright; and

(g)     Debtor agrees that it will not enter into any agreement (for example, a license agreement) which is inconsistent with Debtor's obligations under this Agreement.

3.20     Control.  Debtor will cooperate with Secured Party in obtaining control with respect to Collateral consisting of Deposit Accounts, Investment Property, Letter of Credit Rights, and Electronic Chattel Paper.

3.21     Further Acts.  Where Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying such third party of Secured Party's security interest and in obtaining an acknowledgment from such third party that it is holding such Collateral for the benefit of the Secured Party.

## ARTICLE IV
## COLLECTIONS

Except as otherwise provided in this Article IV, Debtor shall continue to collect, at its own expense, all amounts due or to become due to Debtor under the Accounts constituting part of the Collateral and all other Collateral.  Debtor shall instruct all account debtors under any Accounts to make payment by wire transfer directly to that certain Depository Account, as defined in the Depository Account Pledge Agreement of even date herewith between Debtor and Secured Party, and shall promptly provide evidence of such instructions to Secured Party.  Secured Party shall have the right at any time to notify any account debtor under any Account that it has taken an assignment of the Account and that all payments it makes respect to the Account shall be made to the Depository Account.  In connection with such collections, Debtor may take (and, at Secured Party's request shall take) such action as Debtor or Secured Party may deem necessary or advisable to enforce collection of the Accounts and such other Collateral; provided, however, that Secured Party shall have the right at any time after the occurrence and during the continuance of an Event of Default, without giving written notice to Debtor of Secured Party's intention to do so, to notify the account debtors under any Accounts or obligors with respect to such other Collateral of the assignment of such Accounts and such other Collateral to Secured Party and to direct such account debtors or obligors to make payment of all amounts due or to become due to Debtor thereunder directly to Secured Party and, upon such notification and at the expense of Debtor, to enforce collection of any such Accounts or other Collateral, and to adjust, settle or compromise the amount or payment thereof in the same manner and to the same extent as Debtor might have done, but unless and until Secured Party does so or gives Debtor other instructions, Debtor shall make all collections for Secured Party.  In addition to its rights under the preceding sentence to this Section, Secured Party, at any time after the occurrence and during the continuance of any Event of Default, may require that Debtor instruct all current and future account debtors and obligors on other Collateral to make all payments directly to a lockbox (the "Lockbox") controlled by Secured Party.  All payments received in the Lockbox shall be transferred to a special bank account (the "Collateral Account") maintained for the benefit of Secured Party subject to withdrawal by Secured Party only.  After the earliest to occur of an Event of Default, Secured Party's exercise of its right to direct account debtors or other obligors on any Collateral to make payments directly to Secured Party or to require Debtor to establish a Lockbox, Debtor shall immediately deliver all full and partial payments on any Collateral received by Debtor to Secured Party in their original form, except for endorsements where necessary.  Secured Party, at its sole

PCI-SW-049-001579

discretion, may hold any collections on the Collateral delivered to it or deposited in the Collateral Account as cash collateral or may apply such collections to the payment of the Obligations in such order as Secured Party may elect; provided, however, that after an Event of Default has occurred and is continuing, Secured Party shall apply all collections in accordance with Section 7.7. Until such payments are so delivered to Secured Party, such payments shall be held in trust by Debtor for and as Secured Party's property, and shall not be commingled with any funds of Debtor. Any application of any collection to the payment of any Obligation is conditioned upon final payment of any check or other instrument.

## ARTICLE V
## ASSIGNMENT OF INSURANCE

Debtor hereby assigns to Secured Party, as additional security for payment of the Obligations, any and all monies due or to become due under, and any and all other rights of Debtor with respect to, any and all policies of insurance covering the Collateral. So long as no Default or Event of Default has occurred and is continuing, Debtor may itself adjust and collect for any losses of up to an aggregate amount of $10,000.00 for all occurrences during any of Debtor's fiscal years and Debtor may use the resulting Insurance Proceeds for the replacement, restoration or repair of the Collateral. After the occurrence and during the continuance of a Default or an Event of Default, or after the aggregate amount of losses arising out of all occurrences during any of Debtor's fiscal years exceeds $10,000.00, Secured Party may (but need not) in its own name or in Debtor's name execute and deliver proofs of claim, receive such monies, and settle or litigate any claim against the issuer of any such policy and Debtor directs the issuer to pay any such monies directly to Secured Party and Secured Party, at its sole discretion and regardless of whether Secured Party exercises its right to collect Insurance Proceeds under this sentence, may apply any Insurance Proceeds to the payment of the Obligations, whether due or not, in such order and manner as Secured Party may elect or may permit Debtor to use such Insurance Proceeds for the replacement, restoration or repair of the Collateral.

## ARTICLE VI
## EVENTS OF DEFAULT

The occurrence of any Event of Default as defined in the Master Loan Agreement shall constitute an Event of Default hereunder ("Event of Default").

## ARTICLE VII
## RIGHTS AND REMEDIES ON DEFAULT

Upon the occurrence of an Event of Default, and at any time thereafter until such Event of Default is cured to the satisfaction of Secured Party, and in addition to the rights granted to Secured Party under Articles IV and V hereof, Secured Party may exercise any one or more of the following rights and remedies:

7.1     Acceleration of Obligations.  Declare any and all Obligations to be immediately due and payable, and the same shall thereupon become immediately due and payable without further notice or demand.

11

7.2   <u>Right of Offset</u>. Offset any deposits, including unmatured time deposits, then maintained by Debtor with Secured Party, whether or not then due, against any indebtedness then owed by Debtor to Secured Party whether or not then due.

7.3   <u>Deal with Collateral</u>. In the name of Debtor or otherwise, demand, collect, receive and give receipt for, compound, compromise, settle and give acquittance for and prosecute and discontinue any suits or proceedings in respect of any or all of the Collateral.

7.4   <u>Realize on Collateral</u>. Take any action which Secured Party may deem reasonably necessary or desirable in order to realize on the Collateral, including, without limitation, the power to perform any contract, to endorse in the name of Debtor any checks, drafts, notes, or other instruments or documents received in payment of or on account of the Collateral. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. Secured Party may sell the Collateral without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

7.5   <u>Access to Property</u>. Enter upon and into and take possession of all or such part or parts of the properties of Debtor, including lands, plants, buildings, machinery, equipment, Data Processing Records and Systems and other property as may be necessary or appropriate in the reasonable judgment of Secured Party, to permit or enable Secured Party to store, lease, sell or otherwise dispose of or collect all or any part of the Collateral, and use and operate said properties for such purposes and for such length of time as Secured Party may reasonably deem necessary or appropriate for said purposes without the payment of any compensation to Debtor therefor. Debtor shall provide Secured Party with all information and assistance requested by Secured Party to facilitate the storage, leasing, sale or other disposition or collection of the Collateral after an Event of Default has occurred and is continuing.

7.6   <u>Other Rights</u>. Exercise any and all other rights and remedies available to it by law or by agreement, including rights and remedies under the UCC as adopted in the relevant jurisdiction or any other applicable law, or under the Master Loan Agreement and, in connection therewith, Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party, and any notice of intended disposition of any of the Collateral required by law shall be deemed reasonable if such notice is mailed or delivered to Debtor at its address as shown on Secured Party's records at least 10 days before the date of such disposition.

7.7   <u>Application of Proceeds</u>. All proceeds of Collateral shall be applied in accordance with Minnesota Statutes Section 336.9-609, and such proceeds applied toward the Obligations shall be applied in such order as Secured Party may elect.

7.8   <u>Patents and Trademarks</u>. Upon the occurrence and during the continuance of an Event of Default:

(a)    Secured Party may, at any time and from time to time, upon thirty (30) days' prior notice to Debtor, license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis,

PCI-SW-049-001581

any Patent or Trademark, throughout the world for such term or terms, on such conditions, and in such manner, as Secured Party shall in its sole discretion determine;

(b)     Secured Party may (without assuming any obligations or liability thereunder), at any time enforce (and shall have the exclusive right to enforce) against any licensor, licensee or sublicensee all rights and remedies of Debtor in, to and under any one or more license or other agreements with respect to any Patent or Trademark and take or refrain from taking any action under any such license or other agreement, and Debtor hereby releases Secured Party from, and agrees to hold Secured Party free and harmless from and against, any claims arising out of, any action taken or omitted to be taken with respect to any such license or agreement;

(c)     Any and all payments received by Secured Party under or in respect of any Patent or Trademark (whether from Debtor or otherwise), or received by Secured Party by virtue of the exercise of the license granted to Secured Party by subsection (g) below, shall be applied to the Obligations in accordance with Section 7.7 hereof;

(d)     Secured Party may exercise in respect of the Patents and Trademarks, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC;

(e)     In order to implement the sale, lease, assignment, license, sublicense or other disposition of any of the Patents and Trademarks pursuant to this Section 7.8, Secured Party may, at any time, execute and deliver on behalf of Debtor one or more instruments of assignment of the Patents and Trademarks (or any application or registration thereof), in form suitable for filing, recording or registration in any country. Debtor agrees to pay when due all reasonable costs incurred in any such transfer of the Patents and Trademarks, including any taxes, fees and reasonable attorneys' fees;

(f)     In the event of any sale, lease, assignment, license, sublicense or other disposition of any of the Patents or Trademarks pursuant to this Section, Debtor shall supply to Secured Party or its designee its know-how and expertise relating to the manufacture and sale of the products relating to any Patent or Trademark subject to such disposition, and its customer lists and other records relating to such Patents or Trademarks and to the distribution of said products; and

(g)     For the purpose of enabling Secured Party to exercise rights and remedies under this Agreement at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense at such time any Patent or Trademark, now owned or hereafter acquired by Debtor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer and automatic machinery software and programs used for the compilation or printout thereof.

7.9    <u>Copyrights</u>. Upon the occurrence and during the continuance of an Event of Default:

13

(a)     Secured Party may, at any time and from time to time, upon thirty (30) days' prior notice to Debtor, license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Copyright, for such term or terms, on such conditions, and in such manner, as Secured Party shall in its sole discretion determine;

(b)     Secured Party may (without assuming any obligations or liability thereunder), at any time , enforce (and shall have the exclusive right to enforce) against any licensor, licensee or sublicensee all rights and remedies of Debtor in, to and under any one or more license or other agreements with respect to any Copyright and take or refrain from taking any action under any such license or other agreement and Debtor hereby releases Secured Party from, and agrees to hold Secured Party free and harmless from and against, any claims arising out of, any action taken or omitted to be taken with respect to any such license or agreement;

(c)     Any and all payments received by Secured Party under or in respect of any Copyright (whether from Debtor or otherwise), or received by Secured Party by virtue of the exercise of the license granted to Secured Party by subsection (f) below, shall be applied to the Obligations in accordance with Section 7.7;

(d)     Secured Party may exercise in respect of the Copyrights, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC;

(e)     In order to implement the sale, lease, assignment, license, sublicense or other disposition of any of the Copyrights pursuant to this Section 7.9, Secured Party may, at any time, execute and deliver on behalf of Debtor one or more instruments of assignment of the Copyrights (or any application or registration thereof), in form suitable for filing, recording or registration in the Copyright Office or any country where the relevant Copyright is of material economic value to Debtor.  Debtor agrees to pay when due all reasonable costs incurred in any such transfer of the Copyrights, including any taxes, fees and reasonable attorneys' fees; and

(f)     For the purpose of enabling Secured Party to exercise rights and remedies under this Agreement at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any Copyright, now owned or hereafter acquired by Debtor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer and automatic machinery software and programs used for the compilation or printout thereof.

## ARTICLE VIII
## MISCELLANEOUS

8.1     <u>No Liability on Collateral</u>.  It is understood that neither Secured Party nor Lender does not in any way assume any of Debtor's obligations under any of the Collateral. Debtor hereby agrees to indemnify Secured Party and Lender against all liability arising in connection with or on

14

account of any of the Collateral, except for any such liabilities arising on account of Secured Party's negligence or willful misconduct.

8.2 <u>No Waiver</u>. Secured Party shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by Debtor unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

8.3 <u>Remedies Cumulative</u>. All rights and remedies of Secured Party shall be cumulative and may be exercised singularly or concurrently, at their option, and the exercise or enforcement of any one such right or remedy shall not bar or be a condition to the exercise or enforcement of any other.

8.4 <u>Governing Law</u>. THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT, SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF MINNESOTA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF, BUT GIVING EFFECT TO FEDERAL LAWS OF THE UNITED STATES APPLICABLE TO NATIONAL BANKS except to the extent that the perfection of the security interest hereunder, or the enforcement of any remedies hereunder, with respect to any particular Collateral shall be governed by the laws of a jurisdiction other than the State of Minnesota.

8.5 <u>Expenses</u>. Debtor agrees to pay the reasonable attorneys' fees and legal expenses incurred by Secured Party in the exercise of any right or remedy available to it under this Agreement, whether or not suit is commenced, including, without limitation, attorneys' fees and legal expenses incurred in connection with any appeal of a lower court's order or judgment.

8.6 <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Debtor and Secured Party.

8.7 <u>Recitals</u>. The above Recitals are true and correct as of the date hereof and constitute a part of this Agreement.

8.8 <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

8.9 <u>No Obligation to Pursue Others</u>. Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

PCI-SW-049-001584

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

PETTERS LTD., INC.,
a Minnesota corporation

By: _____

Its: _____

16

<u>EXHIBIT A</u>

I.    Financing Statements on File Listing Debtor or Any Predecessor in Title as Debtor, other than liens permitted under the Master Loan Agreement.

    None.

II.   Location of Inventory (as of the date hereof)

    California
    Colorado
    Florida
    Minnesota

III.  Prior Names within the last five years.

    None.

17

PCI-SW-049-001586

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

Mark Tranovich (612) 607-7517

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Mark Tranovich
Oppenheimer Wolff & Donnelly LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, MN 55402-1609

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| OR | **1a. ORGANIZATION'S NAME** PETTERS LTD., INC. | | | |
| | **1b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS 7585 EQUITABLE DRIVE | CITY EDEN PRAIRIE | STATE MN | POSTAL CODE 55344 | COUNTRY USA |
|---|---|---|---|---|

| 1d. TAX I.D.#, SSN OR EIN 41-1800333 | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION CORPORATION | 1f. JURISDICTION OF ORGANIZATION MINNESOTA | 1g. ORGANIZATIONAL I.D.#, if any MN8O-108 ☐ NON |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| OR | **2a. ORGANIZATION'S NAME** | | | |
| | **2b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX I.D.#, SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL I.D.#, if any ☐ NON |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** – insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| | **3a. ORGANIZATION'S NAME** STAFFORD TOWNE, LTD. | | | |
| | **3b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS c/o Oppenheimer Wolff Donnelly; 45 S. Seventh St., Suite 3300 | CITY Minneapolis | STATE MN | POSTAL CODE 55402-1609 | COUNTRY USA |
|---|---|---|---|---|

**4. This FINANCING STATEMENT covers the following collateral:**

**See attached Addendum A.**

| 5 ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG.LIEN | NON-UCC FILIN |
|---|---|---|---|---|---|---|
| 6 This FINANCING STATEMENT is to be filed (for record) (or recorded) in REAL ESTATE RECORDS. Attach Addendum (if applicable) | | 7 Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) (optional) | | All Debtors | Debtor 1 | Debtor 2 |

**8. OPTIONAL FILER REFERENCE DATA**
21112-12

PCI-SW-049-001587

ADDENDUM A TO UCC-1 FINANCING STATEMENT

DEBTOR:      PETTERS LTD., INC.
TAX I.D. # 41-1800333
SECURED PARTY:     STAFFORD TOWNE, LTD.

    A.    This financing statement covers the following types (or items) of property, whether now owned or hereafter acquired or arising (the "Collateral"):

    Accounts; Chattel Paper; Commercial Tort Claims, if any, described in the definition of Commercial Tort Claims below; Controlled Property; Deposit Accounts; Documents; Equipment and Fixtures; General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Proceeds (whether cash or non-cash Proceeds, including Insurance Proceeds and non-cash Proceeds of all types); Products of all the foregoing; and Supporting Obligations.

For purposes of this financing statement, the following terms shall have the following meanings:

    "Accounts" shall have the meaning provided in Article 9.

    "Chattel Paper" shall have the meaning provided in Article 9 and shall include, without limitation, all Electronic Chattel Paper and Tangible Chattel Paper.

    "Commercial Tort Claim" shall have the meaning provided in Article 9.

    "Controlled Property" shall mean property of every kind and description in which Debtor has or may acquire any interest, now or hereafter at any time in the possession or control of Secured Party for any reason and all dividends and distributions on or other rights in connection with such property.

    "Data Processing Records and Systems" shall mean all of Debtor's now existing or hereafter acquired electronic data processing and computer records, software (including, without limitation, all "Software" as defined in Article 9), systems, manuals, procedures, disks, tapes and all other storage media and memory.

    "Default" shall mean any event which if it continued uncured would, with notice or lapse of time or both, constitute an Event of Default.

    "Deposit Accounts" shall have the meaning provided in Article 9 and shall include, without limitation, any demand, time, savings, passbook or similar account maintained with a bank.

    "Document" shall have the meaning provided in Article 9

    "Electronic Chattel Paper" shall have the meaning provided in Article 9.

    "Equipment" shall have the meaning provided in Article 9.

    "Fixtures" shall have the meaning provided in Article 9.

    "General Intangibles" shall have the meaning provided in Article 9 and shall include, without limitation, all Payment Intangibles.

    "Goods" shall have the meaning provided in Article 9.

    "Instruments" shall have the meaning provided in Article 9.

    "Insurance Proceeds" shall mean all proceeds of any and all insurance policies payable to Debtor with respect to any Collateral, or on behalf of any Collateral, whether or not such policies are issued to or owned by Debtor.

    "Inventory" shall have the meaning provided in Article 9.

    "Investment Property" shall have the meaning provided in the UCC.

    "Letter of Credit Rights" shall have the meaning provided in Article 9.

    "Payment Intangibles" shall have the meaning provided in Article 9.

19

PCI-SW-049-001588

"Proceeds" shall have the meaning provided in Article 9.

"Products" shall mean any goods now or hereafter manufactured, processed or assembled with any of the Collateral.

"Tangible Chattel Paper" shall have the meaning provided in Article 9.

"UCC" shall mean the Uniform Commercial Code as enacted in the State of Minnesota, as amended from time to time, and "Article 9" shall refer to Article 9 of the UCC.

B.      In addition, this financing statement covers the following types (or items) of property, whether now owned or hereafter acquired or arising:

1.      Account No. 2005080 and Account No. 25034562, both in the name of Debtor with HIGHLAND BANK, now located at 5270 West 84th Street, Bloomington, MN 55437 ("Bailee"), any successor and/or replacement accounts, and any and all securities, security entitlements, financial assets, investment property, commodity contracts, money, instruments, documents, goods, chattel paper, accounts, general intangibles, deposit accounts, partnership and limited liability company interests, and other property and rights of any nature now or hereafter held in or constituting part of such account(s) (such account and any successor and/or replacement accounts, the "Depository Accounts").

2.      With respect to any Collateral referred to in B(1) above, but without limiting B(1): all stock and bond powers, certificates and instruments; all replacements, substitutions, interest, cash and stock dividends, warrants, options, and other rights and amounts paid, accrued, received, receivable, or distributed with respect thereto from time to time.

3.      With respect to the foregoing, all products and proceeds thereof, including without limitation insurance proceeds and payments under the Securities Investor Protection Act of 1970, as amended.

TC3: 788731 v04 11/05/2001

PCI-SW-049-001589

# EXHIBIT E

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is entered into as of October 31, 2001, by and between PETTERS COMPANY, INC., a Minnesota corporation with its principal place of business and chief executive office located at 7585 Equitable Drive, Eden Prairie, Minnesota 55344 ("Assignor"), and PETTERS LTD., INC., a Minnesota corporation with its principal place of business and chief executive office located at 7585 Equitable Drive, Eden Prairie, Minnesota 55344 ("Assignee").

## I.    RECITALS

A.      Assignee, Stafford Towne, Ltd., as administrative agent, and the various lenders ("Lenders") have entered into that certain Master Loan Agreement, dated as of October 31, 2001 (the "Master Loan Agreement"), pursuant to which Lenders are providing to Assignee financing for certain transactions as set forth on the Assignment Schedule attached as Exhibit A hereto (each an "Inventory Sale"), involving Assignee's purchase of inventory financed by Lenders (the "Financed Inventory") from vendors (each a "Seller") and Assignee's contemporaneous resale of the Financed Inventory to major retailers or other resellers (each a "Buyer").

B.      Assignor (rather than Assignee) was the party that initially accepted a purchase order to sell such Financed Inventory to a Buyer. Assignor took such actions with the understanding that, if Assignee was successful in arranging financing with Lenders with respect to the Inventory Sales, Assignor would assign to Assignee all of Assignor's right, title and interest in or with respect to the Inventory Sales, on the terms and conditions set forth in this Agreement, and Assignee shall perform and complete such assigned Inventory Sales.

## II.    AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Assignments from Assignor to Assignee**.

(a)    Completion of Assignment Schedule. For each Inventory Sale financed by Lenders pursuant to the Master Loan Agreement, Assignor and Assignee has completed, executed and hereby delivers an Assignment Schedule which Assignment Schedule identifies the Inventory Sale. Such Assignment Schedule is attached hereto as Exhibit A.

(b)    Assignment of Rights. This Agreement and each such Assignment Schedule evidences and constitutes the absolute sale, transfer and assignment to Assignee of all of Assignor's right, title and interest in or with respect to such Inventory Sale, including, without limitation, all accounts and other rights to payment and all payments received and monies due or to become due in connection therewith, all of Assignor's rights and remedies as an unpaid seller under the Uniform Commercial Code and other applicable law, including the rights of stoppage

in transit, replevin, reclamation, and claim and delivery, all of Assignor's rights in and to all security for and guaranties thereof, all documents, chattel paper and general intangibles related thereto, and all other rights against the Seller, the Buyer or any third parties with respect thereto.

(c)     Assumption of Obligations. This Agreement and each Assignment Schedule also evidences and constitutes an assumption by Assignee of all of Assignor's obligations with respect to the Inventory Sales.

(d)     No Other Assignments. Assignor and Assignee acknowledge and agree that the assignment made hereby is only with respect to the Inventory Sales.

2.     **Successors and Assigns; Lenders as Third-Party Beneficiaries**. This Agreement and each Assignment Schedule shall be binding on and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns. Assignor and Assignee agree that Lenders are third-party beneficiaries of, and entitled to enforce, all rights of Assignee under this Agreement, and that this Agreement may not be amended without the prior written consent of Stafford Towne, Ltd., as administrative agent for Lenders.

3.     **Representations and Warranties**. Assignor represents and warrants that it has good title to the Inventory Sales, free and clear of any liens or encumbrances. Assignor will indemnify, defend and hold Assignee harmless from any claims or demands of any nature, including attorneys' fees and costs, whether such claims or demands be valid or not, which allege a set of facts which, if true, would constitute a breach of these representations and warranties.

4.     **Security Interest**. In the event that notwithstanding the intentions of the parties, any Inventory Sale is deemed to not have been assigned under this Agreement by Assignor to Assignee, and to secure the prompt and complete payment, performance and observance of Assignee's and Assignor's obligations to Lenders under the Master Loan Agreement and the Loan Documents (as defined therein), Assignor hereby grants to Lenders, through Assignee, a security interest in such Inventory Sale and all accounts, Financed Inventory, documents, chattel paper and general intangibles related thereto, and to the extent not otherwise included, all proceeds and substitutions and replacements for each of the foregoing. To perfect such security interest, Assignee and Lenders, separately or together, may file a financing statement substantially in the form of Exhibit B attached hereto with respect to the Inventory Sales.

5.     **Miscellaneous**. In the event that any provision of this Agreement is held to be invalid or unenforceable, this Agreement will be construed as not containing such provision and the remainder of the Agreement shall remain in full force and effect. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Minnesota without giving effect to principles of conflicts of law.

PCI-SW-049-001613

IN WITNESS WHEREOF, Assignor and Assignee have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

PETTERS COMPANY, INC.

By: _____
　　　Thomas J. Petters
　　　President


PETTERS LTD., INC.

By: _____
　　　Thomas J. Petters
　　　President

PCI-SW-049-001614

**Exhibit A**

**Assignment Schedule**

This Assignment Schedule is made by PETTERS COMPANY, INC. ("Assignor") and PETTERS LTD., INC. ("Assignee") pursuant to the Assignment Agreement between them dated as of October 31, 2001. This Assignment Schedule is in addition to, and is not in substitution for, all other Assignment Schedules given under the Assignment Agreement.

The following Inventory Sale is assigned by Assignor to Assignee:

| | |
|---|---|
| Buyer Name: | National Distributors |
| Buyer Purchase Order No: | 00-208976 |
| | 00-208969 |
| | 00-208953 |
| | 00-208956 |
| | 00-208955 |
| | 00-208905 |

PETTERS COMPANY, INC.

By: _____

Its: _____

Dated: 11/07/01

PETTERS LTD., INC.

By: _____

Its: _____

Dated: 11/07/01

PCI-SW-049-001615

# EXHIBIT F

## ZERO COUPON
## RECEIVABLE PARTICIPATION NOTE

Principal Amount                      Original Issue Date: July 20, 2005
  Due at Maturity: $13,475,000.00           Minneapolis, Minnesota

      FOR VALUE RECEIVED, PL LTD., INC., a Minnesota corporation (the "Borrower"), hereby promises to pay to Westford Special Situations Master Fund, L.P., or assigns (the "Lender"), to the account set forth below, the principal sum of THIRTEEN MILLION FOUR HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS on the Maturity Date (as defined below).

      The Maturity Date is November 20, 2005.

      At the option of the Borrower, the Maturity Date may be extended to January 20, 2006 (the "Extended Maturity Date"). Upon the election of the Borrower to extend the maturity of this Note to the Extended Maturity Date, the principal due hereunder to the Lender shall increase daily at the monthly rate of Three Hundred Six Thousand Two Hundred Fifty and 00/100 Dollars ($306,250.00) per month (the "Additional Obligation"). The Additional Obligation monthly rate shall be reduced proportionately following each payment of the principal sum that occurs between the Maturity Date and the Extended Maturity Date.

      In the case of a default in payment of principal upon acceleration, upon redemption, or repayment (the "Default Date") or at the Extended Maturity Date, and in such case the overdue principal of this Note shall bear a premium obligation ("Premium Obligation") at a rate of one-tenth of one percent (0.10%) per calendar day accruing from the Extended Maturity Date or the Default Date to the date payment of such principal has been made or duly provided for, provided that if payment is not made within thirty (30) calendar days following the Extended Maturity Date or the Default Date then the overdue principal of this Note shall thereafter bear a Premium Obligation at a rate of two-tenths of one percent (0.20%) per calendar day to the date payment of such principal has been made or duly provided for. The Premium Obligation on any overdue principal shall be payable upon demand. Any such Premium Obligation due on any overdue principal that is not so paid on demand shall increase at the same rate as the rate charged on the Premium Obligation due on the overdue principal (to, the extent that the payment of such Premium Obligation shall be legally enforceable), which shall accrue from the date of such demand for payment to the date payment of such Premium Obligation has been made or duly provided for, and such Premium Obligation shall also be payable upon demand. In the event that the Maturity Date or the Extended Maturity Date, as applicable, is not a Business Day, the principal otherwise payable on such Maturity Date or Extended Maturity Date, as applicable, will be paid on the next succeeding Business Day with the same force and effect as if made on such Maturity Date or Extended Maturity Date.

      This Note is one of the Notes referred to in that certain Master Loan Agreement dated as of October 31, 2001 (herein called the "Agreement") among the Borrower, the Lenders party thereto from time to time, and Stafford Towne, Ltd., as Administrative Agent, to which

Agreement and all agreements supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Borrower and the Holder and of the terms upon which this Note is delivered. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. To the extent that this Note is deemed not to be substantially in the form of either Exhibit A-1 or Exhibit A-2 to the Agreement, the Borrower agrees to amend the Agreement to permit a note in this form. This Note is secured by and the Holder hereof is entitled to the benefits provided under the Loan Documents (as defined in the Agreement). This Note is entitled to the benefits of the Corporate Guaranty and the Personal Guaranty (each as defined in the Agreement).

The outstanding principal amount of this Note and any Additional Obligation on this Note may be prepaid in full at any time, without premium or penalty.

If an Event of Default with respect to this Note shall occur and be continuing, both the principal amount then due on the Note and any Additional Obligation on this Note may be declared due and payable in the manner and with the effect provided in the Agreement.

The Borrower hereby waives presentment, demand, protest, or notice of any kind in connection with this Note.

No reference herein to the Agreement and no provision of this Note or of the Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of (and premium, if any), any Additional Obligation, and any interest on this Note at the times, place and rate, and in the coin or currency, herein prescribed.

The transfer of this Note is registrable in the security register maintained by the Borrower, upon surrender of this Note for registration of transfer at the office or agency of the Borrower in any place where the principal of (and premium, if any), any Additional Obligation, and any interest on this Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Borrower duly executed by, the Holder or such Holder's attorney duly authorized in writing, and thereupon one or more new Notes of this series, of like tenor and of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Prior to due presentment of this Note for registration of transfer, the Borrower and any agent of the Borrower may treat the Person in whose name this Note is registered in the security register as the owner hereof for all purposes, whether or not this Note be overdue, and neither the Borrower nor any such agent shall be affected by notice to the contrary.

This Note shall be governed by and construed in accordance with the laws of the State of Minnesota. The venue, jurisdiction and jury trial waiver provisions set forth in the Agreement are applicable to the Note as if fully set forth herein.

Payment of the principal of, any Additional Obligation, and interest, if any, on this Note will be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payment of the principal of, any Additional Obligation, and interest, if any, on this Note due on the Maturity Date or the Extended Maturity Date, as applicable, will be made in immediately available funds on the

2

Maturity Date or the Extended Maturity Date, as applicable, (whether or not this Note has been presented), with such funds transferred by wire to the following account:

Chase Manhattan Bank, N.Y.
ABA# 021-000-021
F/A/O Goldman Sachs & Co, N.Y.
A/C # 930-1-011483
F/F/C Westford Special Situations Master Fund, L.P.
A/C # 002-031870

or such other account or place as the Administrative Agent shall direct the Borrower in writing. Payments hereunder shall be applied first to any Premium Obligation due, next to any Additional Obligation due, and lastly to the original principal sum due at maturity.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

PCI-SW-056-000367

IN WITNESS WHEREOF, the Borrower has caused this instrument to be duly executed.

**PL LTD., INC.,**
**a Minnesota corporation**

By _Deanna Munson_
Deanna Munson, an officer of PL Ltd., Inc.
VP of Operations

[Signature Page to Promissory Note]

4

2349382 v01 07/20/2005

# EXHIBIT G

# PL LTD., INC.

4400 BAKER ROAD, SUITE 200, MINNETONKA, MN 55343
PHONE 952-934-9918  FAX 952-975-2295

9/5

# PURCHASE ORDER

TO:  ENCHANTED FAMILY BUYING GROUP          SHIP TO: WILL ADVISE
     152 HUNTINGTON STREET
     WAYZATA, MN  55391

| ORDERED BY: | TOM PETTERS | PURCHASE ORDER NUMBER: | 40776 |
|---|---|---|---|
| DATE: | 7-14-05 | SHIP VIA: | BEST WAY |
| PAYMENT TERMS: | WIRE | F.O.B. POINT | KS |

| ITEM NO. | DESCRIPTION | UNIT | QTY. | UNIT COST | TOTAL AMOUNT |
|---|---|---|---|---|---|
| DEHP80MP | PIONEER 60W CD DECK | | 4,200 | $289.00 | $1,213,800.00 |
| AVHP5700DVD | PIONEER IN DASH DVD MULTIMEDIA REC. | | 4,000 | $614.10 | $2,456,400.00 |

| | | |
|---|---|---|
| SUBTOTAL | | $3,670,200.00 |
| Shipping charges | | |
| Handling charges | | |
| Insurance | | |
| Tax rate [ ] % | Tax | $0.00 |
| TOTAL DUE | | $3,670,200.00 |

Your receipt and acceptance of this purchase price for the inventory which is the subject of this purchase order shall be deemed acknowledgment of the following:  (i) all such inventory is being held by you solely for our account and subject to our instructions, with due care; (ii) you have no further rights in such inventory and will defend title to such inventory on our behalf as well as our successors and assigns; and (iii) all such inventory shall be specifically excluded from any and all liens and security interest in favor of your creditors.

#119

PCI-SW-056-000356

# PL LTD., INC.

4400 BAKER ROAD, SUITE 200, MINNETONKA, MN 55343
PHONE 952-934-9918  FAX 952-975-2295

9/14

## PURCHASE ORDER

TO:     ENCHANTED FAMILY BUYING GROUP      SHIP TO: WILL ADVISE
152 HUNTINGTON STREET
WAYZATA, MN  55391

| ORDERED BY: | TOM PETTERS | PURCHASE ORDER NUMBER: | 40779 |
|---|---|---|---|
| DATE: | 7-14-05 | SHIP VIA: | BEST WAY |
| PAYMENT TERMS: | WIRE | F.O.B. POINT | KS |

| ITEM NO. | DESCRIPTION | UNIT | QTY. | UNIT COST | TOTAL AMOUNT |
|---|---|---|---|---|---|
| PDP4312 | PIONEER 43" HDTV READY PLASMA MONITOR | | 2,525 | $2,167.50 | $5,472,937.50 |

| | | |
|---|---|---|
| SUBTOTAL | | $5,472,937.50 |
| Shipping charges | | |
| Handling charges | | |
| Insurance | | |
| Tax rate [ ] %   Tax | | $0.00 |
| TOTAL DUE | | $5,472,937.50 |

Your receipt and acceptance of this purchase price for the inventory which is the subject of this purchase order shall be deemed acknowledgment of the following:  (i) all such inventory is being held by you solely for our account and subject to our instructions, with due care; (ii) you have no further rights in such inventory and will defend title to such inventory on our behalf as well as our successors and assigns; and (iii) all such inventory shall be specifically excluded from any and all liens and security interest in favor of your creditors.

#119

# PL LTD., INC.

4400 BAKER ROAD, SUITE 200, MINNETONKA, MN 55343
PHONE 952-934-9918 FAX 952-975-2295

9/9

# PURCHASE ORDER

TO:
ENCHANTED FAMILY BUYING GROUP
152 HUNTINGTON STREET
WAYZATA, MN 55391

SHIP TO: WILL ADVISE

| ORDERED BY: | TOM PETTERS | PURCHASE ORDER NUMBER: | 40774 |
|---|---|---|---|
| DATE: | 7-14-05 | SHIP VIA: | BEST WAY |
| PAYMENT TERMS: | WIRE | F.O.B. POINT | KS |

| ITEM NO. | DESCRIPTION | UNIT | QTY. | UNIT COST | TOTAL AMOUNT |
|---|---|---|---|---|---|
| HTR5850SL | YAMAHA 630W 6.1CH DIGITAL H.T. RECEIVER | | 3,200 | $274.50 | $878,400.00 |
| HTR5890BL | YAMAHA 980 7.1CH DIGITAL H.T. RECEIVER | | 3,115 | $549.10 | $1,710,446.50 |
| YHTF150 | YAMAHA 730W 6.1CH HOME THEATER SYSTEM | | 3,275 | $578.00 | $1,892,950.00 |

| | | |
|---|---|---|
| SUBTOTAL | | $4,481,796.50 |
| Shipping charges | | |
| Handling charges | | |
| Insurance | | |
| Tax rate ____ % Tax | | $0.00 |
| TOTAL DUE | | $4,481,796.50 |

Your receipt and acceptance of this purchase price for the inventory which is the subject of this purchase order shall be deemed acknowledgment of the following: (i) all such inventory is being held by you solely for our account and subject to our instructions, with due care; (ii) you have no further rights in such inventory and will defend title to such inventory on our behalf as well as our successors and assigns; and (iii) all such inventory shall be specifically excluded from any and all liens and security interest in favor of your creditors.

#119

PCI-SW-056-000350

# EXHIBIT H

TO: PETTERS COMPANY, INC
4400 BAKER ROAD, SUITE 200
MINNETONKA, MN 55343
TEL 952-932-3200

P.O. PAGE   1 OF  1

SHIP TO:   BJ'S # 820 BRISTOL DISTRB CENT
42 RUNWAY RD 215-547-6980
LEVITTOWN   . PA. 19057-00000

PO # SUM9440XX
ORDER DATE          : 07/20/05
REQUIRED DELIVERY: 09/15/05

FAX REP=

FRIGHT TERMS: COLLLECT  PURCHASER PAYS FOB: ORGIN
KANSAS CITY, KS                              FREIGHT CLASS R5.0
ROUTING INSTRUCTIONS· A TO Z TRANSPORTATION

AP# 0875796453     PAYMENT TERMS

| | CD | PCT | CUTOFF | DISC | NET |
|---|---|---|---|---|---|
| | 2 | .0 | 0 | 0 | 60 |

T R A N S M I T T E D : FAX

| LINE NO. | BJ'S SKU | DESCRIPTION | MFG STYLE NO. | UPC | UNITS ORDERED | CASE PACK | CASES ORDERED | PALLET PATTERN | COST | PER | EXTENDED COST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | PIONEER 60W CD DECK | | DEHP80MP | 4200 | | | | $332.35 | EA | $1,395,870.00 |
| 2 | | PIONEER IN DASH DVD MULTIMEDIA REC. | | AVHP5700DVD | 4000 | | | | $706.21 | EA | $2,824,840.00 |
| | | | | | | | | | | | $4,220,710.00 |

CONTACT BUYING OFFICE IMMEDIATELY IF THERE ARE ANY DISCREPANCIES ON THIS PURCHASE ORDER.

PO # SUM9442XX
ORDER DATE       : 07/20/05
REQUIRED DELIVERY: 09/15/05

TO: PETTERS COMPANY, INC
4400 BAKER ROAD, SUITE 200
MINNETONKA, MN 55343
TEL 952-932-3200

P.O. PAGE  1 OF 1

SHIP TO:   BJ'S #820 BRISTOL DISTRB CENT
           42 RUNWAY RD 215-547-6980
           LEVITTOWN  , PA. 19057-00000

FAX REP#

FRIGHT TERMS: COLLLECT  PURCHASER PAYS FOB: ORGIN
KANSAS CITY, KS                  FREIGHT CLASS 85.0
ROUTING INSTRUCTIONS: A TO Z TRANSPORTATION

AP# 0875796453     PAYMENT TERMS
          CD  PCT  CUTOFF  DISC  NET
          2   .0     0       0    60

TRANSMITTED : FAX

| LINE NO. | BJ'S SKU | DESCRIPTION | MFG STYLE NO. | UPC | UNITS ORDERED | CASE PACK | CASES ORDERED | PALLET PATTERN | COST | PER | EXTENDED COST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | PIONEER 43" HDTV READY PLASMA MONITOR | PDP4312 | | 2525 | | | | $2,492.62 | EA | $6,293,865.50 |

CONTACT BUYING OFFICE IMMEDIATELY IF THERE ARE ANY DISCREPANCIES ON THIS PURCHASE ORDER.

# BJ'S WHOLESALE CLUB

## PURCHASE ORDER

PO # SUM9439XX
ORDER DATE : 07/20/05
REQUIRED DELIVERY: 09/15/05

TO. PETTERS COMPANY, INC
4400 BAKER ROAD, SUITE 200
MINNETONKA, MN 55343
TEL 952-932-3200

SHIP TO: BJ'S #820 BRISTOL DISTRB CENT
42 RUNWAY RD 215-547-6980
LEVITTOWN , PA. 19057-00000

FAX REP#

FRIGHT TERMS: COLLLECT PURCHASER PAYS FOB: ORGIN
KANSAS CITY, KS                           FREIGHT CLASS 85.0
ROUTING INSTRUCTIONS. A TO Z TRANSPORTATION

AP# 0875796453    PAYMENT TERMS

| CD | PCT | CUTOFF | DISC | NET |
|----|-----|--------|------|-----|
| 2  | .0  | 0      | 0    | 60  |

TRANSMITTED : FAX

| LINE NO. | BJ'S SKU | DESCRIPTION | MFG STYLE NO. | UPC | UNITS ORDERED | CASE PACK | CASES ORDERED | PALLET PATTERN | COST | PER | EXTENDED COST |
|------|------|-------------|---------------|-----|------|------|------|------|------|-----|------|
| 1 | | YAMAHA 630W 6.1CH DIGITAL H.T. RECEIVER | | HTR5850SL | | 3200 | | | $315.67 | EA | $1,010,144.00 |
| 2 | | YAMAHA 980W 7.1CH DIGITAL H.T. RECEIVER | | HTR5890BL | | 3115 | | | $631.46 | EA | $1,966,997.90 |
| 3 | | YAMAHA 730W 6.1 HOME THEATER SYSTEM | | YHTF1500 | | 3275 | | | $664.70 | EA | $2,176,892.50 |

$5,154,034.40

CONTACT BUYING OFFICE IMMEDIATELY IF THERE ARE ANY DISCREPANCIES ON THIS PURCHASE ORDER.

PCI-SW-056-000351

# EXHIBIT I



Average Prime, AAA Corporate Bond, and Treasury Constant Maturities Rates per http://www.federalreserve.gov/releases/h15/data.htm.
Average Prime Rate - Average majority prime rate charged by banks on short-term loans to business.
AAA Corporate Bond Rate - Moody's yield on seasoned corporate bonds - all industries, AAA.
Treasury Constant Maturities Rate - Nominal (10 Year) - Market yield on U.S. Treasury securities at 10-year constant maturity.

# EXHIBIT J

# Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| 3/29/2007 | $5,374,810.25 | |
| 3/29/2007 | $5,831,382.00 | |
| 2/26/2007 | $1,805,912.25 | |
| 2/23/2007 | $4,388,698.60 | |
| 2/16/2007 | $3,725,330.00 | |
| 2/15/2007 | $4,320,400.00 | |
| 2/15/2007 | $5,564,625.00 | |
| 2/14/2007 | $5,714,713.00 | |
| 2/12/2007 | $5,982,080.00 | |
| 2/9/2007 | $4,290,311.25 | |
| 2/9/2007 | $4,762,070.00 | |
| 2/8/2007 | $5,317,600.00 | |
| 2/2/2007 | $4,401,322.50 | |
| 2/1/2007 | $3,734,070.00 | |
| 2/1/2007 | $5,692,443.75 | |
| 1/26/2007 | $3,738,900.00 | |
| 1/26/2007 | $5,795,256.25 | |
| 1/25/2007 | $111,700.00 | |
| 1/25/2007 | $5,028,300.00 | **$85,579,924.85** |
| **Additional Transfers** | | |
| 9/28/2006 | $3,501,738.50 | |
| 9/28/2006 | $5,668,906.50 | |
| 9/28/2006 | $5,967,360.00 | |
| 9/27/2006 | $5,016,728.50 | |
| 9/26/2006 | $4,024,601.25 | |
| 9/26/2006 | $5,217,172.50 | |
| 9/25/2006 | $3,569,260.00 | |
| 9/25/2006 | $5,975,467.00 | |
| 9/22/2006 | $5,732,604.00 | |
| 9/22/2006 | $5,919,081.25 | |
| 8/8/2006 | $5,568,568.75 | |
| 8/7/2006 | $3,494,094.55 | |
| 8/4/2006 | $5,782,011.60 | |
| 8/4/2006 | $6,025,248.00 | |
| 8/3/2006 | $6,086,340.00 | |
| 6/29/2006 | $5,629,076.50 | |
| 6/28/2006 | $5,646,400.00 | |

# Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 6/27/2006 | $4,320,200.00 | |
| 6/27/2006 | $5,967,045.00 | |
| 6/22/2006 | $4,192,672.00 | |
| 6/22/2006 | $5,483,392.20 | |
| 6/21/2006 | $5,219,870.00 | |
| 6/21/2006 | $5,902,470.00 | |
| 6/20/2006 | $5,579,140.00 | |
| 6/16/2006 | $5,473,243.75 | |
| 6/14/2006 | $3,550,344.00 | |
| 6/14/2006 | $6,035,610.00 | |
| 6/13/2006 | $4,959,275.25 | |
| 6/8/2006 | $5,798,929.50 | |
| 6/8/2006 | $6,022,933.50 | |
| 5/4/2006 | $3,200,327.45 | |
| 5/4/2006 | $5,155,881.25 | |
| 5/3/2006 | $3,694,810.65 | |
| 5/3/2006 | $5,650,684.25 | |
| 5/3/2006 | $5,759,486.25 | |
| 5/2/2006 | $3,326,360.00 | |
| 4/26/2006 | $1,944,807.50 | |
| 4/26/2006 | $5,987,496.00 | |
| 4/21/2006 | $4,882,241.20 | |
| 4/21/2006 | $6,088,949.05 | |
| 4/20/2006 | $3,028,878.35 | |
| 4/11/2006 | $5,711,752.75 | |
| 4/7/2006 | $2,442,720.00 | |
| 4/6/2006 | $5,503,945.50 | |
| 4/6/2006 | $6,231,375.00 | |
| 4/6/2006 | $6,484,855.00 | |
| 4/4/2006 | $5,982,300.00 | |
| 4/3/2006 | $4,985,240.00 | |
| 3/31/2006 | $5,192,951.20 | |
| 3/31/2006 | $5,483,640.00 | |
| 3/30/2006 | $5,391,123.90 | |
| 3/28/2006 | $5,273,237.50 | |
| 3/27/2006 | $3,334,276.25 | |
| 3/24/2006 | $5,836,250.00 | |
| 3/23/2006 | $2,250,663.00 | |
| 3/23/2006 | $5,891,898.75 | |
| 3/23/2006 | $5,968,233.50 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| 3/23/2006 | $6,106,800.00 | |
| 3/21/2006 | $766,211.25 | |
| 3/21/2006 | $5,108,075.00 | |
| 3/21/2006 | $5,919,963.00 | |
| 3/16/2006 | $5,816,125.00 | |
| 3/16/2006 | $5,816,125.00 | |
| 3/8/2006 | $4,829,412.50 | |
| 3/7/2006 | $3,275,145.00 | |
| 3/7/2006 | $5,982,000.00 | |
| 3/3/2006 | $3,525,739.00 | |
| 3/3/2006 | $5,383,980.00 | |
| 3/2/2006 | $5,683,080.00 | |
| 3/2/2006 | $5,874,343.75 | |
| 3/2/2006 | $6,214,320.00 | |
| 2/24/2006 | $3,128,814.60 | |
| 2/24/2006 | $3,913,421.25 | |
| 2/24/2006 | $5,757,939.00 | |
| 2/24/2006 | $6,082,005.00 | |
| 2/23/2006 | $4,320,535.30 | |
| 2/10/2006 | $6,032,118.75 | |
| 2/3/2006 | $5,217,030.00 | |
| 2/2/2006 | $3,518,022.75 | |
| 2/1/2006 | $5,681,000.00 | |
| 1/20/2006 | $5,982,300.00 | |
| 1/17/2006 | $5,425,211.25 | |
| 1/13/2006 | $4,585,230.00 | |
| 1/13/2006 | $5,950,510.00 | |
| 1/12/2006 | $3,573,217.50 | |
| 1/12/2006 | $4,253,190.75 | |
| 1/12/2006 | $5,681,000.00 | |
| 1/12/2006 | $6,148,475.00 | |
| 1/11/2006 | $4,198,414.75 | |
| 1/11/2006 | $6,018,812.50 | |
| 12/16/2005 | $6,098,909.50 | |
| 12/8/2005 | $4,529,397.00 | |
| 12/8/2005 | $5,816,125.00 | |
| 12/2/2005 | $3,020,050.00 | |
| 12/2/2005 | $5,154,034.40 | |
| 12/2/2005 | $6,181,400.00 | |
| 12/1/2005 | $4,220,710.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 12/1/2005 | $6,293,865.50 | |
| 11/21/2005 | $5,200,210.70 | |
| 11/21/2005 | $5,956,464.50 | |
| 11/18/2005 | $3,055,205.00 | |
| 11/17/2005 | $2,687,523.25 | |
| 11/17/2005 | $4,180,180.50 | |
| 11/17/2005 | $5,892,467.00 | |
| 11/17/2005 | $5,969,172.00 | |
| 11/16/2005 | $6,647,000.00 | |
| 11/10/2005 | $5,666,540.00 | |
| 11/1/2005 | $3,226,034.75 | |
| 11/1/2005 | $6,073,696.25 | |
| 10/27/2005 | $5,456,758.25 | |
| 10/27/2005 | $6,427,062.50 | |
| 10/26/2005 | $3,985,108.55 | |
| 10/21/2005 | $6,867,055.00 | |
| 10/20/2005 | $3,573,688.60 | |
| 10/17/2005 | $6,397,734.00 | |
| 10/17/2005 | $6,470,641.25 | |
| 9/28/2005 | $4,159,071.25 | |
| 9/28/2005 | $4,873,551.50 | |
| 9/27/2005 | $5,028,600.00 | |
| 9/22/2005 | $5,581,746.00 | |
| 9/21/2005 | $5,645,512.50 | |
| 9/21/2005 | $5,939,843.75 | |
| 9/15/2005 | $3,813,355.00 | |
| 9/15/2005 | $4,651,096.25 | |
| 9/15/2005 | $6,154,290.00 | |
| 9/14/2005 | $6,666,956.50 | |
| 9/13/2005 | $6,084,606.00 | |
| 9/13/2005 | $6,306,702.50 | |
| 9/9/2005 | $6,393,013.05 | |
| 9/8/2005 | $3,419,200.00 | |
| 9/1/2005 | $3,162,842.15 | |
| 8/26/2005 | $6,356,224.55 | |
| 8/19/2005 | $6,285,750.00 | |
| 8/18/2005 | $5,566,660.20 | |
| 8/18/2005 | $6,178,568.50 | |
| 8/16/2005 | $6,381,713.90 | |
| 8/12/2005 | $5,933,400.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 8/12/2005 | $6,502,655.50 | |
| 8/11/2005 | $6,082,091.70 | |
| 8/5/2005 | $112,447.58 | |
| 8/5/2005 | $3,730,104.50 | |
| 8/3/2005 | $2,992,800.00 | |
| 8/3/2005 | $3,075,827.00 | |
| 7/29/2005 | $3,313,845.00 | |
| 7/29/2005 | $6,023,750.00 | |
| 7/28/2005 | $3,340,301.35 | |
| 7/28/2005 | $4,379,569.10 | |
| 7/28/2005 | $6,537,180.00 | |
| 7/22/2005 | $461,609.42 | |
| 7/22/2005 | $5,538,521.25 | |
| 7/21/2005 | $3,448,298.25 | |
| 7/21/2005 | $3,634,326.00 | |
| 7/21/2005 | $4,031,261.00 | |
| 7/21/2005 | $6,285,750.00 | |
| 7/20/2005 | $2,640,050.00 | |
| 7/20/2005 | $5,992,415.00 | |
| 7/15/2005 | $4,612,395.00 | |
| 7/15/2005 | $6,385,175.00 | |
| 7/14/2005 | $5,470,697.75 | |
| 7/14/2005 | $6,281,400.00 | |
| 7/7/2005 | $5,876,284.50 | |
| 6/30/2005 | $6,072,034.50 | |
| 6/30/2005 | $6,146,180.90 | |
| 6/8/2005 | $4,869,242.00 | |
| 6/8/2005 | $5,531,460.00 | |
| 6/3/2005 | $6,026,777.10 | |
| 6/2/2005 | $2,652,586.50 | |
| 6/2/2005 | $4,319,986.45 | |
| 5/27/2005 | $5,346,839.75 | |
| 5/27/2005 | $6,688,000.00 | |
| 5/26/2005 | $3,514,996.00 | |
| 5/26/2005 | $4,176,900.00 | |
| 5/26/2005 | $6,463,600.00 | |
| 5/25/2005 | $4,992,686.90 | |
| 5/24/2005 | $4,564,755.00 | |
| 5/24/2005 | $5,966,460.00 | |
| 5/20/2005 | $35,827.50 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 5/20/2005 | $3,499,094.00 | |
| 5/20/2005 | $5,276,638.65 | |
| 5/19/2005 | $4,549,322.25 | |
| 5/19/2005 | $6,474,322.50 | |
| 5/19/2005 | $6,599,875.00 | |
| 5/17/2005 | $6,453,370.00 | |
| 5/13/2005 | $4,274,250.00 | |
| 5/13/2005 | $4,579,971.50 | |
| 5/11/2005 | $3,069,175.00 | |
| 5/10/2005 | $6,406,575.00 | |
| 5/6/2005 | $6,344,917.75 | |
| 5/4/2005 | $2,746,752.75 | |
| 5/4/2005 | $3,814,773.75 | |
| 5/3/2005 | $3,078,140.75 | |
| 5/3/2005 | $4,538,150.00 | |
| 4/29/2005 | $5,657,175.00 | |
| 4/29/2005 | $6,020,080.00 | |
| 4/29/2005 | $6,687,024.00 | |
| 4/28/2005 | $3,227,067.35 | |
| 4/27/2005 | $3,668,292.05 | |
| 4/27/2005 | $4,881,737.60 | |
| 4/26/2005 | $2,178,800.00 | |
| 4/22/2005 | $4,774,500.00 | |
| 4/22/2005 | $5,206,696.25 | |
| 4/22/2005 | $5,581,746.00 | |
| 4/20/2005 | $5,704,027.50 | |
| 4/19/2005 | $4,330,762.50 | |
| 4/19/2005 | $5,371,113.00 | |
| 4/15/2005 | $4,063,230.00 | |
| 4/15/2005 | $6,023,843.75 | |
| 4/14/2005 | $2,665,012.50 | |
| 4/14/2005 | $2,969,414.75 | |
| 4/14/2005 | $6,537,180.00 | |
| 4/8/2005 | $5,524,417.00 | |
| 4/7/2005 | $3,062,975.00 | |
| 4/7/2005 | $4,399,899.00 | |
| 4/7/2005 | $5,775,916.35 | |
| 4/6/2005 | $3,705,128.70 | |
| 4/5/2005 | $6,101,290.00 | |
| 3/31/2005 | $3,176,130.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 3/31/2005 | $5,278,314.75 | |
| 3/30/2005 | $6,168,416.00 | |
| 3/25/2005 | $2,663,231.00 | |
| 3/24/2005 | $5,091,187.50 | |
| 3/24/2005 | $6,014,112.00 | |
| 3/22/2005 | $5,514,600.00 | |
| 3/22/2005 | $6,600,000.00 | |
| 3/17/2005 | $6,034,320.00 | |
| 3/11/2005 | $4,324,596.00 | |
| 3/11/2005 | $5,238,125.00 | |
| 3/10/2005 | $4,588,597.50 | |
| 3/9/2005 | $4,458,692.00 | |
| 3/4/2005 | $2,360,434.00 | |
| 3/4/2005 | $6,155,006.40 | |
| 3/3/2005 | $5,115,762.40 | |
| 3/3/2005 | $6,201,940.00 | |
| 3/3/2005 | $6,212,078.75 | |
| 3/2/2005 | $4,196,384.60 | |
| 3/2/2005 | $4,358,120.00 | |
| 3/2/2005 | $5,984,872.10 | |
| 3/1/2005 | $6,065,027.45 | |
| 3/1/2005 | $6,392,669.55 | |
| 2/28/2005 | $4,065,821.85 | |
| 2/28/2005 | $4,107,757.60 | |
| 2/28/2005 | $5,185,611.25 | |
| 2/28/2005 | $7,023,561.15 | |
| 2/24/2005 | $3,350,929.95 | |
| 2/23/2005 | $6,704,600.00 | |
| 2/18/2005 | $5,028,600.00 | |
| 2/10/2005 | $5,967,880.00 | |
| 2/8/2005 | $3,936,963.20 | |
| 2/8/2005 | $5,770,142.50 | |
| 2/4/2005 | $2,663,253.75 | |
| 2/4/2005 | $3,556,109.00 | |
| 2/4/2005 | $4,871,173.50 | |
| 2/3/2005 | $5,011,791.40 | |
| 1/20/2005 | $4,817,503.75 | |
| 1/20/2005 | $5,852,294.50 | |
| 1/14/2005 | $3,960,101.50 | |
| 1/14/2005 | $6,200,000.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 1/13/2005 | $2,363,998.00 | |
| 1/13/2005 | $4,799,267.50 | |
| 1/13/2005 | $6,558,132.50 | |
| 1/3/2005 | $6,034,320.00 | |
| 1/3/2005 | $6,168,320.00 | |
| 12/22/2004 | $3,871,945.00 | |
| 12/22/2004 | $5,363,800.00 | |
| 12/21/2004 | $5,757,292.75 | |
| 12/21/2004 | $5,866,700.00 | |
| 12/20/2004 | $6,266,502.50 | |
| 12/17/2004 | $3,837,012.00 | |
| 12/17/2004 | $5,631,920.00 | |
| 12/16/2004 | $5,657,175.00 | |
| 12/10/2004 | $3,955,762.50 | |
| 12/9/2004 | $6,086,915.10 | |
| 12/9/2004 | $6,457,839.45 | |
| 12/8/2004 | $5,764,214.40 | |
| 12/3/2004 | $6,138,421.70 | |
| 12/2/2004 | $4,987,612.45 | |
| 12/2/2004 | $6,165,901.70 | |
| 11/29/2004 | $4,363,089.50 | |
| 11/24/2004 | $578,000.00 | |
| 11/24/2004 | $5,374,350.00 | |
| 11/23/2004 | $5,499,900.00 | |
| 11/23/2004 | $6,068,382.50 | |
| 11/18/2004 | $3,897,010.00 | |
| 11/10/2004 | $5,901,717.30 | |
| 11/5/2004 | $5,513,562.50 | |
| 11/4/2004 | $4,277,797.00 | |
| 10/28/2004 | $5,834,130.00 | |
| 9/21/2004 | $4,396,875.00 | |
| 9/21/2004 | $5,257,921.50 | |
| 9/17/2004 | $2,535,960.00 | |
| 9/16/2004 | $5,014,817.50 | |
| 9/13/2004 | $2,517,550.00 | |
| 9/13/2004 | $6,720,313.00 | |
| 9/10/2004 | $5,443,876.05 | |
| 9/10/2004 | $6,187,779.00 | |
| 9/9/2004 | $5,887,093.75 | |
| 9/9/2004 | $6,493,000.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| 9/2/2004 | $3,254,614.50 | |
| 8/30/2004 | $5,024,969.00 | |
| 8/27/2004 | $6,914,325.00 | |
| 8/26/2004 | $4,634,056.00 | |
| 8/26/2004 | $5,342,625.00 | |
| 8/25/2004 | $6,819,974.50 | |
| 8/23/2004 | $2,811,432.50 | |
| 8/23/2004 | $5,743,047.50 | |
| 8/20/2004 | $5,028,600.00 | |
| 8/20/2004 | $5,035,396.25 | |
| 8/19/2004 | $2,852,016.50 | |
| 8/19/2004 | $6,725,725.50 | |
| 8/18/2004 | $6,891,863.50 | |
| 8/17/2004 | $3,772,375.00 | |
| 8/17/2004 | $5,733,482.00 | |
| 8/13/2004 | $7,218,542.00 | |
| 8/12/2004 | $5,228,487.50 | |
| 8/12/2004 | $5,284,150.25 | |
| 8/11/2004 | $6,110,067.45 | |
| 8/11/2004 | $6,169,300.50 | |
| 8/11/2004 | $6,495,459.25 | |
| 8/6/2004 | $5,571,572.90 | |
| 8/6/2004 | $6,032,195.40 | |
| 8/6/2004 | $7,375,431.70 | |
| 8/5/2004 | $6,829,143.30 | |
| 8/4/2004 | $3,373,984.50 | |
| 8/4/2004 | $4,041,657.50 | |
| 8/4/2004 | $4,876,907.95 | |
| 8/4/2004 | $5,327,928.50 | |
| 8/3/2004 | $6,034,320.00 | |
| 8/2/2004 | $3,516,975.00 | |
| 7/16/2004 | $4,534,954.05 | |
| 7/15/2004 | $6,164,888.25 | |
| 7/13/2004 | $6,094,728.00 | |
| 7/12/2004 | $2,951,136.43 | |
| 7/9/2004 | $5,530,254.75 | |
| 7/9/2004 | $5,791,989.00 | |
| 7/8/2004 | $5,613,847.50 | |
| 7/7/2004 | $3,768,750.00 | |
| 7/7/2004 | $4,806,750.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 7/1/2004 | $3,160,430.00 | |
| 7/1/2004 | $4,875,995.00 | |
| 7/1/2004 | $5,131,495.00 | |
| 6/24/2004 | $4,926,781.25 | |
| 6/23/2004 | $4,070,543.00 | |
| 6/23/2004 | $4,772,570.00 | |
| 6/22/2004 | $4,856,531.00 | |
| 6/22/2004 | $6,192,140.00 | |
| 6/16/2004 | $6,211,223.00 | |
| 6/16/2004 | $6,683,097.75 | |
| 6/15/2004 | $2,638,597.50 | |
| 6/15/2004 | $4,102,195.25 | |
| 6/15/2004 | $4,128,369.00 | |
| 6/10/2004 | $4,472,250.00 | |
| 6/8/2004 | $4,040,160.75 | |
| 6/8/2004 | $6,399,140.00 | |
| 6/7/2004 | $4,271,700.00 | |
| 6/3/2004 | $3,590,400.00 | |
| 6/2/2004 | $2,348,078.50 | |
| 6/2/2004 | $4,740,726.55 | |
| 6/2/2004 | $6,063,397.75 | |
| 5/28/2004 | $4,793,916.90 | |
| 5/28/2004 | $6,180,572.30 | |
| 5/27/2004 | $7,002,777.45 | |
| 5/26/2004 | $4,069,771.30 | |
| 5/20/2004 | $3,973,870.00 | |
| 5/20/2004 | $5,362,400.00 | |
| 5/20/2004 | $5,956,462.00 | |
| 5/19/2004 | $5,984,436.25 | |
| 5/18/2004 | $5,173,154.00 | |
| 5/17/2004 | $5,277,195.00 | |
| 5/14/2004 | $4,959,606.75 | |
| 5/14/2004 | $5,381,451.50 | |
| 5/13/2004 | $6,236,808.70 | |
| 5/13/2004 | $6,818,195.00 | |
| 5/12/2004 | $2,966,902.90 | |
| 5/12/2004 | $6,793,880.25 | |
| 5/7/2004 | $5,328,600.00 | |
| 5/6/2004 | $4,135,780.00 | |
| 5/5/2004 | $3,813,809.45 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 5/5/2004 | $5,583,118.50 | |
| 5/5/2004 | $5,751,447.25 | |
| 5/4/2004 | $6,398,487.50 | |
| 5/3/2004 | $5,786,196.25 | |
| 5/3/2004 | $6,721,480.80 | |
| 4/29/2004 | $5,919,287.25 | |
| 4/29/2004 | $6,405,551.25 | |
| 4/27/2004 | $5,110,001.50 | |
| 4/22/2004 | $4,487,752.25 | |
| 4/15/2004 | $6,294,755.75 | |
| 4/14/2004 | $6,348,167.25 | |
| 4/13/2004 | $4,068,360.00 | |
| 4/8/2004 | $5,109,800.30 | |
| 4/8/2004 | $5,825,773.10 | |
| 4/7/2004 | $1,659,575.55 | |
| 4/7/2004 | $2,115,740.25 | |
| 4/7/2004 | $5,965,691.40 | |
| 4/1/2004 | $3,640,950.30 | |
| 4/1/2004 | $7,634,501.10 | |
| 3/30/2004 | $8,399,782.40 | |
| 3/25/2004 | $2,892,696.00 | |
| 3/25/2004 | $4,617,868.50 | |
| 3/25/2004 | $5,314,204.75 | |
| 3/25/2004 | $5,954,516.00 | |
| 3/16/2004 | $4,216,216.10 | |
| 3/12/2004 | $462,000.00 | |
| 3/11/2004 | $4,970,435.95 | |
| 3/11/2004 | $5,466,272.55 | |
| 3/11/2004 | $5,635,397.75 | |
| 3/11/2004 | $5,926,366.00 | |
| 3/9/2004 | $5,280,726.00 | |
| 3/9/2004 | $5,613,566.10 | |
| 3/5/2004 | $5,866,830.50 | |
| 3/4/2004 | $2,437,414.00 | |
| 3/4/2004 | $6,081,415.00 | |
| 2/26/2004 | $2,527,500.00 | |
| 2/26/2004 | $4,463,791.00 | |
| 2/26/2004 | $5,025,155.00 | |
| 2/25/2004 | $6,797,989.50 | |
| 2/25/2004 | $7,319,879.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| 2/24/2004 | $3,777,541.50 | |
| 2/19/2004 | $4,526,529.00 | |
| 2/12/2004 | $2,531,796.00 | |
| 2/11/2004 | $4,881,750.00 | |
| 2/11/2004 | $6,238,662.50 | |
| 2/10/2004 | $5,989,765.05 | |
| 2/10/2004 | $6,727,475.00 | |
| 2/2/2004 | $4,335,025.00 | |
| 2/2/2004 | $5,583,842.50 | |
| 1/29/2004 | $4,126,275.00 | |
| 1/29/2004 | $6,043,350.00 | |
| 1/29/2004 | $7,950,367.75 | |
| 1/21/2004 | $5,494,296.00 | |
| 1/20/2004 | $5,743,098.65 | |
| 1/16/2004 | $6,183,453.60 | |
| 1/14/2004 | $5,268,276.50 | |
| 1/12/2004 | $6,279,985.05 | |
| 1/6/2004 | $5,961,642.00 | |
| 1/5/2004 | $3,476,798.55 | |
| 1/5/2004 | $6,095,811.75 | |
| 1/2/2004 | $4,484,709.25 | |
| 12/16/2003 | $3,940,999.80 | |
| 12/16/2003 | $7,348,500.00 | |
| 12/11/2003 | $5,946,344.25 | |
| 12/2/2003 | $4,250,109.50 | |
| 11/26/2003 | $3,528,817.75 | |
| 11/26/2003 | $6,151,834.50 | |
| 11/25/2003 | $3,471,200.55 | |
| 11/24/2003 | $4,790,320.05 | |
| 11/21/2003 | $4,176,901.00 | |
| 11/21/2003 | $5,129,242.50 | |
| 11/10/2003 | $4,036,514.50 | |
| 11/7/2003 | $5,155,860.50 | |
| 11/7/2003 | $6,335,775.00 | |
| 11/6/2003 | $3,585,380.80 | |
| 11/6/2003 | $5,897,618.55 | |
| 11/5/2003 | $3,938,828.05 | |
| 11/5/2003 | $6,088,353.85 | |
| 11/4/2003 | $4,377,350.25 | |
| 11/4/2003 | $6,358,014.00 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 11/3/2003 | $6,107,875.00 | |
| 10/23/2003 | $4,550,725.00 | |
| 10/23/2003 | $4,701,446.00 | |
| 10/23/2003 | $5,360,407.50 | |
| 10/22/2003 | $5,622,371.30 | |
| 10/22/2003 | $5,702,305.50 | |
| 10/21/2003 | $5,657,769.00 | |
| 10/10/2003 | $4,789,459.10 | |
| 10/9/2003 | $4,944,625.00 | |
| 10/9/2003 | $6,342,716.25 | |
| 10/8/2003 | $5,193,916.95 | |
| 10/6/2003 | $5,632,098.66 | |
| 10/2/2003 | $5,831,852.97 | |
| 10/2/2003 | $7,760,175.00 | |
| 10/1/2003 | $4,406,729.65 | |
| 10/1/2003 | $6,758,622.00 | |
| 9/22/2003 | $5,580,300.00 | |
| 9/18/2003 | $3,609,433.75 | |
| 9/18/2003 | $4,128,180.90 | |
| 9/18/2003 | $6,193,423.25 | |
| 9/17/2003 | $6,723,000.00 | |
| 9/11/2003 | $6,508,909.25 | |
| 9/9/2003 | $3,981,983.25 | |
| 9/8/2003 | $73,055.12 | |
| 9/8/2003 | $4,186,594.70 | |
| 9/5/2003 | $5,817,259.25 | |
| 9/5/2003 | $6,074,494.50 | |
| 9/4/2003 | $6,470,282.10 | |
| 8/27/2003 | $3,780,150.00 | |
| 8/27/2003 | $4,317,441.50 | |
| 8/27/2003 | $6,938,100.00 | |
| 8/25/2003 | $4,428,348.75 | |
| 8/25/2003 | $7,620,516.00 | |
| 8/13/2003 | $4,292,703.20 | |
| 8/13/2003 | $5,749,973.55 | |
| 8/12/2003 | $6,341,117.40 | |
| 8/11/2003 | $2,443,892.56 | |
| 8/7/2003 | $5,019,273.75 | |
| 8/6/2003 | $2,947,741.00 | |
| 8/6/2003 | $6,353,388.75 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
### (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 8/6/2003 | $7,352,612.00 | |
| 8/6/2003 | $9,358,400.00 | |
| 8/5/2003 | $4,571,126.00 | |
| 7/31/2003 | $2,579,659.50 | |
| 7/21/2003 | $5,714,476.80 | |
| 7/18/2003 | $4,935,927.50 | |
| 7/17/2003 | $4,769,590.50 | |
| 7/17/2003 | $6,050,380.55 | |
| 7/2/2003 | $3,142,374.00 | |
| 7/2/2003 | $3,536,922.50 | |
| 7/1/2003 | $6,071,773.50 | |
| 6/5/2003 | $6,388,721.20 | |
| 6/5/2003 | $6,576,401.20 | |
| 6/5/2003 | $6,632,175.40 | |
| 6/2/2003 | $2,391,478.95 | |
| 5/30/2003 | $2,891,342.80 | |
| 5/14/2003 | $2,489,371.78 | |
| 5/13/2003 | $4,016,853.00 | |
| 5/13/2003 | $6,490,850.14 | |
| 5/8/2003 | $4,227,770.00 | |
| 5/1/2003 | $3,671,185.25 | |
| 4/22/2003 | $38,215.20 | |
| 4/22/2003 | $4,740,005.50 | |
| 4/22/2003 | $5,905,529.30 | |
| 4/15/2003 | $5,570,340.00 | |
| 4/11/2003 | $6,366,952.50 | |
| 4/3/2003 | $4,920,474.00 | |
| 4/3/2003 | $5,218,580.45 | |
| 4/3/2003 | $6,392,496.75 | |
| 4/2/2003 | $3,744,287.50 | |
| 4/2/2003 | $5,878,797.25 | |
| 3/31/2003 | $6,003,364.00 | |
| 3/21/2003 | $2,941,180.60 | |
| 3/21/2003 | $6,016,807.50 | |
| 3/21/2003 | $6,223,668.75 | |
| 3/18/2003 | $7,381,473.00 | |
| 3/5/2003 | $6,016,497.00 | |
| 2/28/2003 | $7,350,797.50 | |
| 2/26/2003 | $2,517,775.50 | |
| 2/26/2003 | $8,449,726.90 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| 2/21/2003 | $2,466,439.50 | |
| 2/21/2003 | $8,985,861.00 | |
| 2/20/2003 | $4,318,217.50 | |
| 2/20/2003 | $6,941,113.25 | |
| 2/13/2003 | $2,621,488.00 | |
| 2/12/2003 | $5,366,628.75 | |
| 2/12/2003 | $6,423,757.25 | |
| 2/12/2003 | $7,558,514.50 | |
| 1/27/2003 | $3,212,324.53 | |
| 1/27/2003 | $3,747,937.55 | |
| 1/24/2003 | $6,386,452.25 | |
| 1/23/2003 | $4,946,038.00 | |
| 1/23/2003 | $6,647,253.05 | |
| 1/16/2003 | $4,692,254.75 | |
| 1/10/2003 | $3,785,778.85 | |
| 1/10/2003 | $6,934,591.25 | |
| 1/9/2003 | $3,527,254.28 | |
| 1/9/2003 | $3,843,793.75 | |
| 1/9/2003 | $6,282,615.00 | |
| 11/21/2002 | $6,282,615.00 | |
| 11/20/2002 | $4,461,806.54 | |
| 11/20/2002 | $6,081,013.50 | |
| 10/24/2002 | $4,347,892.80 | |
| 10/24/2002 | $4,548,570.00 | |
| 10/24/2002 | $4,645,759.85 | |
| 10/24/2002 | $5,037,933.90 | |
| 10/21/2002 | $5,473,859.35 | |
| 10/18/2002 | $3,734,332.00 | |
| 10/16/2002 | $3,163,056.00 | |
| 9/24/2002 | $2,070,280.32 | |
| 9/20/2002 | $7,737,992.35 | |
| 9/6/2002 | $5,413,642.00 | |
| 9/5/2002 | $1,942,184.00 | |
| 8/30/2002 | $2,373,617.50 | |
| 8/30/2002 | $5,725,549.80 | |
| 8/27/2002 | $1,770,151.50 | |
| 8/23/2002 | $4,813,813.40 | |
| 8/15/2002 | $5,111,775.75 | |
| 8/15/2002 | $5,864,836.75 | |
| 8/7/2002 | $4,579,363.50 | |

# Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|---|---|---|
| 8/7/2002 | $6,532,055.75 | |
| 8/2/2002 | $2,879,492.35 | |
| 7/29/2002 | $7,522,030.00 | |
| 7/26/2002 | $2,857,773.50 | |
| 7/26/2002 | $3,447,225.25 | |
| 7/16/2002 | $3,911,515.00 | |
| 7/12/2002 | $4,460,056.50 | |
| 7/11/2002 | $3,781,477.75 | |
| 7/10/2002 | $5,232,024.00 | |
| 7/1/2002 | $4,563,601.50 | |
| 6/27/2002 | $4,294,886.50 | |
| 6/14/2002 | $2,131,453.75 | |
| 4/26/2002 | $4,445,159.25 | |
| 4/25/2002 | $4,933,725.00 | |
| 4/24/2002 | $3,632,287.75 | |
| 4/22/2002 | $2,324,892.75 | |
| 4/19/2002 | $5,664,886.90 | |
| 4/12/2002 | $5,294,938.55 | |
| 4/10/2002 | $2,938,153.64 | |
| 4/9/2002 | $1,904,015.61 | |
| 4/4/2002 | $1,940,153.50 | |
| 4/2/2002 | $6,191,575.75 | |
| 3/28/2002 | $4,529,487.50 | |
| 3/28/2002 | $4,973,241.25 | |
| 3/20/2002 | $6,047,505.75 | |
| 3/15/2002 | $3,697,538.10 | |
| 3/13/2002 | $3,240,175.00 | |
| 3/11/2002 | $5,981,175.00 | |
| 3/1/2002 | $4,590,342.50 | |
| 2/22/2002 | $2,761,477.89 | |
| 2/19/2002 | $6,498,535.60 | |
| 2/5/2002 | $3,003,367.50 | |
| 1/2/2002 | $2,000,000.00 | |
| 1/2/2002 | $3,500,000.00 | |
| 1/2/2002 | $4,500,000.00 | |
| 12/28/2001 | $4,880,000.00 | |
| 12/28/2001 | $5,600,000.00 | |
| 12/14/2001 | $3,807,390.00 | |
| 12/3/2001 | $3,290,228.78 | |
| 11/26/2001 | $4,939,481.45 | |

## Transfers to or for the Benefit of PETTERS LIMITED (PL), INC.
## (EPSILON INVESTMENT MANAGEMENT, LLC)

| Date | Amount | Subtotal |
|------|--------|----------|
| 11/16/2001 | $2,021,250.00 | |
| 11/15/2001 | $4,591,410.00 | |
| 11/7/2001 | $5,436,201.35 | |
| 10/12/2001 | $10,184,714.20 | |
| 10/2/2001 | $6,604,564.49 | |
| 9/24/2001 | $5,317,700.00 | *$3,117,860,063.24* |
| **Transfers** | **$3,203,439,988.09** | |

# EXHIBIT K

## Transfers from PETTERS LIMITED (PL), INC. (EPSILON INVESTMENT MANAGEMENT, LLC) to PCI

| Date | Amount | Subtotal |
|------|--------|----------|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| 3/29/2007 | $1,723,577.90 | |
| 2/16/2007 | $485,830.00 | |
| 2/16/2007 | $2,762,016.36 | |
| 2/12/2007 | $4,291,531.97 | |
| 2/2/2007 | $2,060,222.76 | **$11,323,178.99** |
| **Additional Transfers** | | |
| 9/28/2006 | $4,677,445.74 | |
| 9/26/2006 | $2,959,417.82 | |
| 8/8/2006 | $4,831,755.32 | |
| 6/29/2006 | $5,063,841.58 | |
| 6/22/2006 | $4,743,405.80 | |
| 6/14/2006 | $4,672,050.17 | |
| 5/4/2006 | $5,019,418.47 | |
| 4/26/2006 | $218,165.07 | |
| 4/11/2006 | $3,998,835.42 | |
| 4/4/2006 | $3,427,618.15 | |
| 3/28/2006 | $3,956,143.06 | |
| 3/23/2006 | $2,072,218.33 | |
| 3/16/2006 | $2,950,107.49 | |
| 3/3/2006 | $4,102,113.92 | |
| 2/24/2006 | $2,346,697.05 | |
| 2/10/2006 | $4,060,156.65 | |
| 1/17/2006 | $3,346,105.86 | |
| 1/12/2006 | $3,432,652.45 | |
| 12/8/2005 | $2,909,979.25 | |
| 12/2/2005 | $2,048,107.12 | |
| 11/21/2005 | $2,431,712.00 | |
| 11/17/2005 | $3,974,310.37 | |
| 11/1/2005 | $94,738.79 | |
| 10/27/2005 | $2,961,452.49 | |
| 9/28/2005 | $3,811,616.85 | |
| 9/21/2005 | $4,016,441.21 | |
| 9/13/2005 | $4,696,215.82 | |
| 8/19/2005 | $2,726,431.74 | |
| 8/16/2005 | $4,427,335.77 | |
| 8/3/2005 | $2,906,154.71 | |
| 7/28/2005 | $4,051,330.90 | |

## Transfers from PETTERS LIMITED (PL), INC. (EPSILON INVESTMENT MANAGEMENT, LLC) to PCI

| Date | Amount | Subtotal |
|---|---|---|
| 7/21/2005 | $5,315,845.23 | |
| 7/14/2005 | $1,968,431.08 | |
| 7/7/2005 | $2,582,061.71 | |
| 6/8/2005 | $3,693,094.78 | |
| 5/27/2005 | $4,183,798.66 | |
| 5/25/2005 | $4,191,685.92 | |
| 5/19/2005 | $5,327,596.77 | |
| 5/11/2005 | $762,157.31 | |
| 5/4/2005 | $3,069,267.00 | |
| 5/3/2005 | $2,511,896.65 | |
| 4/20/2005 | $2,912,811.36 | |
| 4/15/2005 | $1,387,599.57 | |
| 4/14/2005 | $2,560,886.35 | |
| 4/8/2005 | $682,586.60 | |
| 3/31/2005 | $3,248,433.47 | |
| 3/30/2005 | $3,240,950.49 | |
| 3/22/2005 | $3,214,937.40 | |
| 3/10/2005 | $3,253,727.88 | |
| 3/3/2005 | $3,415,468.49 | |
| 3/2/2005 | $2,852,979.08 | |
| 2/28/2005 | $2,806,177.30 | |
| 2/23/2005 | $4,620,935.26 | |
| 2/8/2005 | $2,405,298.71 | |
| 1/20/2005 | $4,210,262.76 | |
| 1/14/2005 | $3,640,726.67 | |
| 12/22/2004 | $2,727,672.55 | |
| 12/21/2004 | $2,657,029.00 | |
| 12/16/2004 | $707,234.08 | |
| 12/8/2004 | $3,218,866.99 | |
| 11/29/2004 | $4,335,862.84 | |
| 11/10/2004 | $2,697,413.93 | |
| 9/21/2004 | $1,222,314.57 | |
| 9/21/2004 | $3,935,648.97 | |
| 9/9/2004 | $4,936,815.92 | |
| 8/26/2004 | $3,220,823.93 | |
| 8/20/2004 | $3,938,372.00 | |
| 8/17/2004 | $5,347,833.17 | |
| 8/12/2004 | $743,037.75 | |
| 8/11/2004 | $5,654,986.06 | |
| 8/6/2004 | $1,205,235.58 | |

## Transfers from PETTERS LIMITED (PL), INC. (EPSILON INVESTMENT MANAGEMENT, LLC) to PCI

| Date | Amount | Subtotal |
|---|---|---|
| 8/4/2004 | $2,669,071.22 | |
| 7/16/2004 | $162,687.80 | |
| 7/9/2004 | $2,951,136.43 | |
| 7/1/2004 | $1,687,920.00 | |
| 6/24/2004 | $2,043,744.69 | |
| 6/16/2004 | $5,557,846.62 | |
| 6/8/2004 | $34,453.54 | |
| 6/3/2004 | $746,916.14 | |
| 6/2/2004 | $1,912,886.82 | |
| 5/20/2004 | $3,835,722.69 | |
| 5/18/2004 | $4,334,050.67 | |
| 5/13/2004 | $1,449,523.46 | |
| 5/7/2004 | $3,974,386.59 | |
| 5/4/2004 | $1,306,077.23 | |
| 4/29/2004 | $4,200,615.00 | |
| 4/15/2004 | $4,892,140.15 | |
| 4/8/2004 | $459,715.21 | |
| 4/2/2004 | $2,061,843.36 | |
| 3/25/2004 | $1,229,285.25 | |
| 3/16/2004 | $4,216,342.20 | |
| 3/9/2004 | $1,989,754.18 | |
| 3/8/2004 | $2,006,933.99 | |
| 2/25/2004 | $959,054.77 | |
| 2/10/2004 | $1,237,240.05 | |
| 2/2/2004 | $4,758,300.22 | |
| 1/21/2004 | $2,646,763.57 | |
| 1/6/2004 | $2,946,687.07 | |
| 12/17/2003 | $357,216.36 | |
| 12/2/2003 | $2,679,887.06 | |
| 11/12/2003 | $2,295,794.23 | |
| 11/6/2003 | $3,694,216.72 | |
| 10/24/2003 | $2,208,940.82 | |
| 10/10/2003 | $3,373,015.45 | |
| 10/3/2003 | $1,104,904.97 | |
| 9/22/2003 | $3,356,963.30 | |
| 9/9/2003 | $2,929,562.43 | |
| 8/28/2003 | $3,481,493.98 | |
| 8/13/2003 | $247,141.05 | |
| 8/7/2003 | $2,815,722.30 | |
| 7/21/2003 | $5,150,462.51 | |

## Transfers from PETTERS LIMITED (PL), INC. (EPSILON INVESTMENT MANAGEMENT, LLC) to PCI

| Date | Amount | Subtotal |
|---|---|---|
| 6/6/2003 | $2,209,105.03 | |
| 5/14/2003 | $1,816,402.62 | |
| 5/9/2003 | $1,333,604.70 | |
| 5/1/2003 | $2,797,139.00 | |
| 4/16/2003 | $336,440.31 | |
| 4/4/2003 | $766,678.94 | |
| 4/3/2003 | $5,797,643.47 | |
| 3/21/2003 | $652,673.27 | |
| 3/6/2003 | $3,041,414.50 | |
| 2/27/2003 | $283,963.50 | |
| 2/21/2003 | $6,452,456.58 | |
| 2/19/2003 | $82,351.90 | |
| 1/10/2003 | $643,966.79 | |
| 11/25/2002 | $5,242,644.44 | |
| 10/29/2002 | $381,069.77 | |
| 10/24/2002 | $7,337,933.90 | |
| 4/29/2002 | $6,508,886.00 | |
| 1/3/2002 | $8,000,000.00 | |
| 1/2/2002 | $12,000,000.00 | *$397,193,534.03* |
| **Transfers** | **$408,516,713.02** | |